**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION**

| | | |
|---|---|---|
| **JOHN L. CRAYTON** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No.:    2:07-cv-626-MEF** |
| | ) | |
| **ALABAMA DEPARTMENT OF** | ) | **(LEAD CASE)** |
| **AGRICULTURE & INDUSTRIES,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***

| | | |
|---|---|---|
| **JOHN L. CRAYTON** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No.:    2:07-cv-1111-MEF** |
| | ) | |
| **ALABAMA DEPARTMENT OF** | ) | **(MEMBER CASE)** |
| **AGRICULTURE & INDUSTRIES,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## DEFENDANT'S EVIDENTIARY SUBMISSION IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

**COMES NOW,** the Defendant Alabama Department of Agriculture & Industries, and makes the following Evidentiary Submission in support of the Motion for Summary Judgment contemporaneously filed herewith.

1. Deposition Excerpts of John Crayton

2. Affidavit of Lance Hester

3. Written reprimand dated October 4, 2004

4. Memorandum dated October 4, 2004

5. Written Warning dated May 11, 2005

6.      Letter to Crayton dated July 28, 2006

7.      EEOC Charge of Discrimination dated September 27, 2006

8.      Referral to EAP dated November 14, 2006

9.      Dr. Smith Report dated December 5, 2006

10.     EEOC Charge of Discrimination dated May 3, 2007


        /s/      Emily C. Marks
EMILY C. MARKS


        /s/      E. Hamilton Wilson, Jr.
E. HAMILTON WILSON, JR.
Attorneys for the Defendant

OF COUNSEL:
BALL, BALL, MATTHEWS & NOVAK, P.A.
2000 Interstate Park Drive, Suite 204
Post Office Box 2148
Montgomery, Alabama  36102-2148
Phone:  (334) 387-7680
Fax:      (334) 387-3222

2

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on May 30, 2008, I electronically filed the foregoing with the Clerk of the Court, using the CM/ECF system which will send notification of such filing to the following:

Juraldine Battle-Hodge
207 Montgomery St., Ste. 215
Montgomery, AL  36104-3528

/s/ Emily C. Marks
OF COUNSEL

# DEPOSITION OF JOHN L. CRAYTON

## April 17, 2008

## Pages 1 through 180

## PREPARED BY:

**Haislip, Ragan, Green, Starkie & Watson, P.C.**
**566 South Perry Street**
**Post Office Box 62**
**Montgomery, AL  36104**
**Phone: (334) 263-4455**
**Fax: (334) 263-9167**
**E-mail: haislipragan@charter.net**

Deposition of John L. Crayton                    April 17, 2008

Page 13

1    A.    -- Montgomery County.

2    Q.    Okay.  When you were hired with the Department

3          of Agriculture in May of '76, what position

4          were you hired for?

5    A.    Seed analyst.

6    Q.    And at that time was your office located in

7          downtown Montgomery?

8    A.    I was in the current location, 1445 Federal

9          Drive.

10   Q.    In the Beard Building?

11   A.    Yes.

12   Q.    And how long did you stay in your position as

13         a seed analyst?

14   A.    25 years.

15   Q.    And you were elevated to the position as a

16         program director for the seed program; is that

17         right?

18   A.    Yeah.  That was my final promotion, yes.

19   Q.    And how long did you serve in that position?

20   A.    Well, I'm in that position now as program

21         director and my title is program director.

22   Q.    All right.  Let me back up.  Prior to I

23         believe it's September of 19 -- I'm sorry,

Deposition of John L. Crayton                    April 17, 2008

1          September of 2006, what position were you in?

2          You were a program director, but what was your

3          title?

4     A.   Well, that was my title.

5     Q.   I'm asking you what was it prior to September

6          of 2006.

7     A.   Program director, seed -- well, seed program

8          director.  I think that's -- I'm not clearly

9          sure what -- you know, because they changed --

10         it was changed -- continually changing from

11         time to time.  So I think that it was program

12         director of seeds.

13    Q.   And you had been in that position prior to

14         September of 2006 for how long?

15    A.   2006.  Six or seven.  About seven years, seven

16         or eight years.

17    Q.   And when you were first elevated to that

18         position, who was your supervisor?  Do you

19         recall?

20    A.   Wilma Fitzpatrick.

21    Q.   And what was Ms. Fitzpatrick's position at

22         that time?

23    A.   Program director.

Deposition of John L. Crayton                    April 17, 2008

1    Q.    And she's still employed with the department,

2          is she not?

3    A.    Yes, she is.

4    Q.    What is her position today?  Do you know?

5    A.    Program director.

6    Q.    How long did Ms. Fitzpatrick stay your

7          supervisor?

8    A.    I can't recall.  It was -- Two years, I think.

9    Q.    About two years?

10         And Ms. Fitzpatrick is a black female?

11   A.    Yes, she is.

12   Q.    Why was she discontinued as your supervisor?

13   A.    I don't know.

14   Q.    Who replaced her?

15   A.    Lance Hester and Doug Rigney.

16   Q.    Lance Hester and Doug Rigney?

17   A.    Yes.

18   Q.    And do you remember what year that occurred?

19   A.    I think it was 2005, I think it was.  I'm not

20         sure.

21   Q.    And at the time Mr. Hester and Mr. Rigney

22         became your supervisors, what were their

23         positions?

eb6eea52-51d4-4051-8cab-631fb47e1833

Deposition of John L. Crayton                    April 17, 2008

Page 16

1    A.    Lance Hester was -- I think at that point he

2           was division director.  And Doug Rigney was

3           deputy commissioner, I think.

4    Q.    Tell me when you first were assigned a vehicle

5           by the Department of Agriculture.

6    A.    I'm not sure.  Probably around '0 --

7    Q.    Just ballpark.

8    A.    '04, I think.

9    Q.    You didn't have a vehicle assigned to you back

10         in the late '90s?

11    A.    No.

12    Q.    So it was sometime in '04 that you first got a

13         vehicle?

14    A.    I'm sure -- Well, I'm not sure, but I think it

15         was somewhere -- My vehicle was -- I only had

16         my vehicle for a short while, and I think the

17         governor had all the -- all vehicles taken up.

18    Q.    So you think you were assigned a vehicle

19         sometime in '04.

20    A.    I -- I think so, but I'm not sure.

21    Q.    Okay.  But you only had it for a short period

22         of time.

23    A.    Yes.

Deposition of John L. Crayton                    April 17, 2008

Page 17

1    Q.    Why were you assigned a vehicle?

2    A.    My job required me to travel.

3    Q.    In your position as --

4    A.    Program director.

5    Q.    For the seed program.

6    A.    Yes.

7    Q.    And how often would you travel during the

8          week?

9    A.    At that time I wasn't.  My -- The job

10         situation was such that I didn't have time to

11         travel.

12   Q.    Okay.  So you just basically used the car to

13         go to and from work?

14   A.    Right.  I attend meetings in Auburn

15         periodically, but ...

16   Q.    How often would you travel to Auburn?

17   A.    Maybe twice a year.

18   Q.    And how long did you have that vehicle before

19         the governor's order came down about

20         restricting vehicles for State employees?

21   A.    I don't remember.

22   Q.    Would it have been less than a year?

23   A.    Oh, yes.

Deposition of John L. Crayton                    April 17, 2008

Page 18

1   Q.   How did you become aware of the governor's

2        directive concerning State vehicles?

3   A.   Well, it was in the news and department --

4        There was a memo put out in the department

5        that all vehicles will be recalled because of

6        the budget crunch.

7   Q.   And the governor's directive?

8   A.   Yes.

9   Q.   Do you remember who sent that memo out?

10  A.   No, I don't.

11  Q.   Did you discuss that with anyone?

12  A.   Well, it was my supervisor -- Well, I think it

13       was my supervisor who at that point I think

14       was Ronnie Murphy.

15  Q.   Did you make a request of Mr. Murphy that you

16       be able to keep your vehicle at that point?

17  A.   No, it wasn't a -- just a -- It wasn't a

18       discussion that I initiated.  It was a staff

19       meeting and where the discussion came up that

20       all vehicles would be taken up.

21  Q.   Well, did you ever ask Mr. Murphy or request

22       of Mr. Murphy that you be able to keep your

23       vehicle?

Deposition of John L. Crayton                          April 17, 2008

1   A.   No, I didn't.

2   Q.   And there were other employees at the

3        department who also lost their vehicle,

4        correct?

5   A.   Yes.

6   Q.   Black and white.

7   A.   Yes.

8   Q.   Now, at some point -- and again, I believe

9        it's sometime in -- and my dates may be wrong,

10       but sometime in September of 2006 when your

11       position changed or your job duties changed,

12       you were assigned a vehicle; is that correct?

13  A.   Yes.

14  Q.   Okay.  And why were you assigned a vehicle?

15  A.   Well, a group of us -- a group of us had gone

16       down to ASEA complaining about the racial

17       conditions in the department.  And that was

18       one of the topics that was brought up was the

19       fact that at that point vehicles had been

20       reissued, and we had noticed that blacks had

21       not -- and myself included, along with Wilma,

22       had not received vehicles and wasn't never

23       offered -- the vehicle was never offered to

Deposition of John L. Crayton                    April 17, 2008

Page 20

1           us.

2    Q.     In June of 2006 did you have a need for a

3           State vehicle other than getting to and from

4           work?

5    A.     Well, I was -- I was request -- In my new

6           duties, my current duties, I was -- part of my

7           duty was to travel to the different

8           universities, mainly Auburn, Tuskegee and

9           other -- and attend other professional

10          meetings as it related to genetically modified

11          engineering plants in agriculture.

12   Q.     All right.  I understand that in this new

13          position that you were assigned in September

14          of 2006, your duties and responsibilities

15          changed, correct?

16   A.     Correct.

17   Q.     Required more travel or required travel.

18   A.     Right.

19   Q.     And you were assigned a vehicle.

20   A.     Yes.

21   Q.     Right.  But when you met with the State

22          Employees Association back in June of 2006,

23          you hadn't been assigned to that position yet,

Page 21

1          had you?

2     A.   No.

3     Q.   And you didn't need a vehicle at that point

4          other than to go to and from work.

5     A.   Well, my duties as program director in the

6          seed division was still the same.  They had

7          not changed.

8     Q.   Right.  But I think you already told me that

9          you only went to Auburn maybe twice a year,

10         and you mainly used your State vehicle to

11         drive from home to work each day; is that

12         correct?

13    A.   Well, mainly, yes.  But my job entailed

14         traveling across the state to visit seed

15         outlets and to visit with inspectors.

16    Q.   How often would you do that?

17    A.   I never did do it.

18    Q.   If you needed to do that, you could have

19         gotten a car out of the pool or -- I mean,

20         they had vehicles available if you needed to

21         travel during the workday, correct?

22    A.   Yes.

23    Q.   When you had this meeting with the -- And I'm

Deposition of John L. Crayton                    April 17, 2008

Page 22

1          going to ask about this meeting later, but you

2          referenced the meeting you had with the State

3          Employees Association.  I think it was in June

4          of 2006.  Were there any specific complaints

5          about individuals within the department who

6          had been assigned vehicles as opposed to those

7          who had not received vehicles?

8     A.   Well, we had noticed that the whites had

9          received their vehicles back, and many of them

10         were just traveling from home to work daily.

11    Q.   Who were those whites that you indicate?

12    A.   Right offhand, I can't remember their names.

13    Q.   And who were some of the blacks who had not

14         received vehicles that you believe should have

15         received a vehicle?

16    A.   Well, myself and Wilma Fitzpatrick.

17    Q.   And when did you notice that vehicles were

18         being reassigned to department employees?

19    A.   I -- I don't have a -- I can't put a date to

20         it.  It was over a period of time that the

21         cars were reissued.

22    Q.   Do you have a judgment as to over this period

23         of time about how many cars were reissued?

Deposition of John L. Crayton                              April 17, 2008

Page 23

1    A.    No, I don't.

2    Q.    I want to ask you some questions, Mr. Crayton,

3          specifically about the complaint that's been

4          filed in this case, the consolidated case.

5                    MR. WILSON:  I'm looking at the

6                    amended complaint.

7                    MS. BATTLE-HODGE:  Is that the

8                    amended?

9                    MR. WILSON:  Uh-huh (positive

10                   response).

11                   MS. BATTLE-HODGE:  Okay.

12   Q.    I'm looking on page 3.  And in paragraph seven

13         you state there that you began working for the

14         Department of Agriculture in May of 1976.  I

15         think that's what you told me earlier,

16         correct?

17   A.    Right.

18   Q.    And then in that next paragraph you state that

19         from January 2002 to July 2006 you were

20         constantly harassed and discriminated in every

21         aspect of your duties as seed program director

22         by Ronnie Murphy, Lance Hester, Doug Rigney,

23         and Ron Sparks.

Deposition of John L. Crayton                    April 17, 2008

Page 24

1          What's the basis of that claim?

2    A.    Well, my data -- my database was constantly

3          being queried and -- and they were constantly

4          questioning me as to why I would make

5          violation of certain lots of seeds that we

6          tested.  And it was a constantly ongoing

7          situation where that they were constantly

8          scrutinizing the decisions that I made.

9          And neither one of these individuals had

10         any kind of background in laboratory work, you

11         know, the requirements as they related to seed

12         testing and the rules for testing seeds

13         specifically spelled out as to how tests was

14         to be handled and how -- you know, what the

15         requirements were in making decisions as to

16         whether or not a lot of seed was to be

17         violated.

18   Q.    Tell me, if you could, just explain to me as

19         the seed program director, what were your

20         duties and responsibilities.

21   A.    To enforce the Truth in Labeling Law as it

22         relates to seeds, the seed industry.

23   Q.    And to do that, what do you have to do?

Deposition of John L. Crayton                     April 17, 2008

Page 26

1          checking for expiration test dates and pulling

2          samples and either sending them in or bringing

3          them into the lab.

4     Q.   Am I correct that before these seeds can be

5          transferred or sold in commerce, interstate

6          commerce or intrastate commerce, they have to

7          be tested by a lab?

8     A.   They must have a current test date, yes.

9     Q.   Right.  Either a private lab or the Department

10         of Agriculture's lab.

11    A.   Right.

12    Q.   So your lab actually competes with private

13         testing labs; is that correct?

14    A.   No.

15    Q.   Why not?

16    A.   We never did -- Well, we weren't in

17         competition with private labs.  Seeds are --

18         Seed lots could be tagged using private

19         laboratories, but -- that way they could enter

20         interstate and intrastate commerce.

21    Q.   Right.  But am I correct that before the seeds

22         can be transferred in interstate commerce,

23         they have to have your certification?

Deposition of John L. Crayton                    April 17, 2008

Page 27

1    A.    No, they don't have to have my certification.

2          We don't certify.  We -- They have to have a

3          test date.  They have to be labeled.  The lot

4          has -- was required to be labeled.

5    Q.    By your department?

6    A.    If they were in intrastate commerce in the

7          state of Alabama, yes.

8    Q.    Right.  And is it important that when you

9          received these samples that they be tested and

10         the results timely be given to these seed

11         suppliers or farmers?

12   A.    Yes.

13   Q.    Now, you told me, you said that your database

14         was being queried.  Who was looking into your

15         database?

16   A.    Ronnie Murphy had a young man by the name of

17         Donnie Walker to query the database.

18   Q.    And how did that affect your ability to do

19         your job?

20   A.    It wasn't that -- It did not affect my ability

21         to do my job, but it was just that it was

22         constantly -- he was constantly questioning

23         me.  And due to the fact that we were

eb6eea52-51d4-4051-8cab-631fb47e1833

Deposition of John L. Crayton                    April 17, 2008

Page 30

1       doing.

2   Q.   What position does -- Is it Andrae McMillian?

3   A.   Yes.

4   Q.   What position does he hold?

5   A.   I think that they have promoted him to unit

6        manager or something.

7   Q.   And is he not doing the work that you

8        previously were doing prior to September of

9        2006?

10  A.   No.

11  Q.   And is he white or black?

12  A.   He's black.

13  Q.   And how long has he been with the department?

14       Do you know?

15  A.   I can't -- not -- Right offhand, I don't

16       remember.

17  Q.   More than four or five years?

18  A.   I think five, maybe six.

19  Q.   Okay.  Is he a certified seed specialist?

20  A.   Yes, he is.

21  Q.   Are you?

22  A.   No, I'm not.

23  Q.   Okay.  Were you ever requested or asked to

eb6eea52-51d4-4051-8cab-631fb47e1833

Deposition of John L. Crayton                    April 17, 2008

Page 31

1      become certified as a seed specialist?

2  A.   After I became program director.

3  Q.   And did you -- Well, why didn't you ever

4      become certified?

5  A.   At this point I didn't see no need in -- With

6      my advanced degree and my research and my

7      years of experience, I didn't see no need.

8  Q.   Does that position today require that that

9      individual be certified as a seed specialist?

10  A.   No.

11  Q.   Go back to page 3, if you would.  In paragraph

12      nine you're stating that in your position as

13      State seed program director, your job was to

14      enforce this Truth in Labeling Law.  Tell me

15      again what that law is.

16  A.   Well, as it relates to seeds, there has to

17      be a claim -- in order for a product or a seed

18      product to be sold in the state of Alabama, it

19      has to have -- it has to carry a claim as to

20      its purity and to its quality.  Purity and

21      quality.

22  Q.   Is that a state law or a federal law?

23  A.   Well, the Truth in Labeling Law is both

eb6eea52-51d4-4051-8cab-631fb47e1833

1          who's responsible for that -- in that

2          position.

3     Q.   And how did that affect your ability to do

4          your job?

5     A.   Well, it was a constant harassment.  And

6          here -- you know, racism, you know, it takes

7          many faces.  And in this day and time, it's

8          not as blatant as it was in the '50s and the

9          '60s.  They are not -- You know, they're just

10         not -- they're not as blatant in their

11         attacking individuals of color as they were in

12         the '50s and '60s.

13    Q.   But you felt like this was being done because

14         you were black?

15    A.   Well, they wanted me out of the position, and

16         they wanted --

17    Q.   And is that the position of State seed program

18         director?

19    A.   Right.

20    Q.   Okay.  And when you say they wanted me out of

21         the position, who are you talking about?

22    A.   Ronnie Murphy, Ron Sparks, Doug Rigney, Lance

23         Hester.

eb6eea52-51d4-4051-8cab-631fb47e1833

Deposition of John L. Crayton                                April 17, 2008

Page 34

1    Q.    And it's your position they wanted you out

2          just because you were black.

3    A.    That was a major factor in it, yes.

4    Q.    What other factors would be in it?

5    A.    Well, I -- Well, that -- well, as -- Right

6          offhand, I can't come up with another thing.

7    Q.    Let's look at paragraph 14 on the following

8          page there.  You say that on April 30th of

9          2003, you applied for the position of division

10       director.  Do you recall that?

11    A.    Yes.

12    Q.    And how did that come about that you applied

13       for that position?

14    A.    Well, it was announced and I applied.

15    Q.    Who announced it?

16    A.    It was put in the job announcement from

17       Personnel downtown, and I'm assuming that the

18       department had requested the register to be

19       established.

20    Q.    And so you applied for that position?

21    A.    Yes, I did.

22    Q.    And you said you were ranked four out of

23       eight; is that right?

Deposition of John L. Crayton                    April 17, 2008

Page 35

1    A.    I think about -- Yes.

2    Q.    Do you know who was ranked above you?

3    A.    Lance Hester.

4    Q.    Do you know what --

5    A.    No, wait a minute.  I take that -- George

6          Paris was above me.

7    Q.    Do you know what position he was ranked at?

8    A.    He was ranked number three, I think.

9    Q.    Do you know who was ranked -- Well, George

10         Parish, is he black?

11   A.    Yes.

12   Q.    And do you know who was ranked number two?

13   A.    Lance Hester.

14   Q.    And who was ranked number one?

15   A.    I can't think of the gentleman's name.

16   Q.    And you say the position was awarded to

17         Mr. Hester.

18   A.    Yes.

19   Q.    And that you had a master's degree and he did

20         not.

21   A.    Right.

22   Q.    And you claim you were denied this promotion

23         because of your race.

Deposition of John L. Crayton                          April 17, 2008

Page 36

1    A.    My -- Well, I was ranked on the register in a

2          racial -- I mean, I think that it was racially

3          controlled in the sense that the department

4          has inroads in Personnel, and they call and

5          they make requests of individuals in State

6          Personnel.

7    Q.    Who did the ranking?

8    A.    I don't know.

9    Q.    Is that the State Personnel Board that does

10         the ranking?

11   A.    Well, they assign analysts to those ...

12   Q.    But that's not the Department of Agriculture

13         that determines where you place on the

14         register, is it?

15   A.    Well, they influence who is placed where the

16         on the register.

17   Q.    Who is they?

18   A.    The commissioner and -- Well, mainly the

19         commissioner.

20   Q.    Do you have any knowledge that the

21         commissioner had any influence at all about

22         where you were placed on the register at this

23         particular time?

Page 37

1   A.   Right offhand, no.

2   Q.   In fact, back during this period of time, was

3        it your understanding that there was a

4        directive in place that a less-qualified

5        white -- or strike that -- there was a

6        directive in place that you -- a department or

7        a State agency could not award a position to a

8        white who had the same qualifications as a

9        black at that time?

10  A.   I'm familiar with the Frazer rule.

11  Q.   Tell me what your understanding of the Frazer

12       rule is.

13  A.   That a black cannot be skipped over to hire a

14       white.

15  Q.   Okay.  And it's your contention that

16       Mr. Hester was less qualified than you were?

17  A.   Yes.

18  Q.   And when is it your understanding that

19       Mr. Hester assumed the position of program --

20       or division director?

21  A.   I can't put a date to it.

22  Q.   Would it have been sometime after April of

23       '03?  Is that right?

Deposition of John L. Crayton                                    April 17, 2008

1    A.    I can't -- I can't put a date to it.

2    Q.    All right.  Well, when you found out that he

3          had been awarded this position and you had

4          not, did you make any complaints to anyone at

5          the Department of Agriculture?

6    A.    No.

7    Q.    Let me go to paragraph 15.  And you make an

8          assertion in paragraph 15 of your amended

9          complaint that on October 4th of 2004, you

10         were summoned to the commissioner's office in

11         the afternoon and that you met with several

12         individuals, including Commissioner Sparks,

13         and that you were given a letter of reprimand

14         for failing to perform your job properly; is

15         that right?

16   A.    Right.

17   Q.    What was the basis for the reprimand, as you

18         recall?

19   A.    Well, that was the basis.  They said that I

20         didn't perform my job properly.

21   Q.    Did they give you any specifics about why you

22         were being reprimanded?

23   A.    Well, there were three letters that I -- I

Deposition of John L. Crayton                      April 17, 2008

Page 39

1           think that was after the fact that I -- that I

2           was given, a letter of complaint from Bragg

3           Farm by Jeannie Bragg and a letter from I

4           think UAB Southeast and another letter.  I

5           can't remember.

6      Q.   What were these letters -- What were the

7           complaints contained in these letters?

8      A.   Well, one -- one letter stated that they had

9           been having problems with the seed lab for the

10          past, oh, X number years.  I can't remember

11          how many years it was.  But, anyway, another

12          letter was from Bragg Farm saying that --

13          pretty much in the same vein, that they was

14          having problems receiving their test results

15          back from the seed lab.  And I think all three

16          of them was pretty much in that same vein.

17     Q.   And this would have been while you were the --

18     A.   Program director.

19     Q.   -- program director.

20     A.   Yes.

21     Q.   And you would agree that it is necessary and

22          it's -- for your department, the seed lab, to

23          get these test results back as quickly as

Deposition of John L. Crayton                    April 17, 2008

Page 40

1    possible.

2    A.    Yes.

3    Q.    I'm going to just show you what I've just

4    marked as Defendant's Exhibit 1 to your

5    deposition and just ask you if you can

6    identify that for me, please.

7    A.    Yes.

8             (Defendant's Exhibit 1 was marked for

9             identification.)

10   Q.    And that was the memorandum dated October 4th,

11   2004 that you were given at this meeting with

12   Commissioner Sparks --

13   A.    Yes.

14   Q.    -- in his office?

15           MS. BATTLE-HODGE:  Do you have

16            another copy of that?

17           MS. MARKS:  Just that one and your

18            copy.

19           MR. WILSON:  Yeah.  Do you want a

20            copy now?

21        (Discussion held off the Record.)

22   A.    Now, I would like to explain this.  In those

23   letters, during the time that -- when -- there

Page 46

1          correct these problems; is that right?

2     A.   I'm not following your question.

3     Q.   Well, in this reprimand for failure to perform

4          job properly, it's asking you that the

5          purpose -- on the second page, that middle

6          paragraph, it says:  The purpose of this

7          reprimand is to facilitate correction.  In

8          other words, they were trying to address to

9          you that these problems that had been

10         reported, that they needed to be corrected.

11              Will you agree that's just what it says?

12    A.   Yes.

13    Q.   Okay.  And they were also asking you in that

14         next paragraph, the next to the last

15         paragraph, that steps need to be taken to

16         assure similar problems do not reoccur.

17              Is that what it says?

18    A.   Yes.

19    Q.   And further in that paragraph it says:  It

20         will be necessary for you to provide a written

21         weekly summary of the samples on hand in the

22         laboratory.

23              After October 4, 2004, did you continue

Deposition of John L. Crayton                    April 17, 2008

Page 48

| | | |
|---|---|---|
| 1 | | October 4th and some of the complaints that |
| 2 | | are referenced in the memorandum of October |
| 3 | | 4th; is that correct? |
| 4 | A. | Right. |
| 5 | Q. | And I notice that at the bottom of page 3 and |
| 6 | | on page 4, there's a cc to John Knight, |
| 7 | | Chairman Ways & Means; Thomas E. Jackson, |
| 8 | | Chairman Agriculture Committee; Thad Clammy -- |
| 9 | | is that Thad McClammy? -- Representative |
| 10 | | District 76? |
| 11 | A. | Right. |
| 12 | Q. | And the Alabama State Employees Association. |
| 13 | A. | Right. |
| 14 | Q. | You furnished those individuals and that |
| 15 | | entity with a copy of that memorandum? |
| 16 | A. | I don't know if I did or not all of them.  I |
| 17 | | don't know if I did all of them or not. |
| 18 | Q. | Why would you furnish John Knight a copy? |
| 19 | A. | Well, I was being harassed and it was a |
| 20 | | constant thing, and I wanted relief. |
| 21 | Q. | You were being harassed because you had gotten |
| 22 | | a reprimand on October 4th? |
| 23 | A. | Well, that reprimand was part of the |

Page 49

1        harassment.

2    Q.    Okay.  And what about Thomas Jackson, why

3          would you send him a copy of this?

4    A.    He's on the ag board, I think.

5    Q.    Okay.  And Thad McClammy?

6    A.    Well, I got to know him through my work --

7          volunteer work with -- in the community in

8          that he assisted us in that part of the

9          county, that part of Montgomery County in

10         establishing a volunteer fire department.

11   Q.    Is he your State representative?

12   A.    Yes.

13   Q.    You live in his district?

14   A.    I think I do, yes.

15   Q.    Mr. Knight, Mr. Jackson, and Mr. McClammy,

16         they're all black, correct?

17   A.    Right.

18   Q.    But you don't know if you actually did send

19         them a copy of this exhibit?

20   A.    John Knight got a copy.  Thad McClammy got a

21         copy.  But I don't know if I gave Tom Jackson

22         a copy.

23   Q.    And you sent them a copy because you felt like

eb6eea52-51d4-4051-8cab-631fb47e1833

Page 50

1          this was part of the harassment you were

2          receiving.

3     A.   Well, in an effort to get relief from the

4          hassle that I was being given, that I was

5          receiving through my employer, yes.

6     Q.   Okay.  And you contend that that harassment

7          was solely because you were black.

8     A.   Well, my color had -- had -- played a factor

9          in it, a major factor in it, yes.

10    Q.   Now, in paragraph 17, going back to page 5 of

11         your amended complaint -- it's on page 5 --

12         you state on October 7th that the commissioner

13         sent a letter to the Alabama seed industry and

14         to your counterparts, both state and federal,

15         informing them that he was taking over the

16         day-to-day operations of the program and that

17         any communication with the seed laboratory was

18         to be directed exclusively to him, Doug

19         Rigney, or Mr. Hester.  And you say this was

20         another step in usurping your responsibilities

21         and authorities.

22    A.   Right.

23    Q.   Why do you say that?  What's the basis of it?

Deposition of John L. Crayton                          April 17, 2008

Page 66

1          were reprimanded is because you were black?

2     A.   That -- That's one -- My color played a -- It

3          was one of the major factors in it, yes.

4     Q.   Let me ask you about the -- about paragraph

5          21.  This was an incident that occurred at the

6          department on or about June the 29th of 2006.

7          Do you recall that incident that's reflected

8          there in paragraph 21?

9     A.   Yes, I do.

10    Q.   Tell me about what you recall happened on that

11         day.

12    A.   On that day?

13    Q.   Yes, sir.

14    A.   I returned from lunch, and I parked in a

15         parking lot that I don't normally park in

16         and -- due to the fact that it was -- there

17         was no spaces in -- where I normally park.  I

18         parked about -- if you can imagine -- Well, I

19         don't know if you're familiar with the

20         Coliseum parking lot.

21    Q.   A little bit.

22    A.   The fence that separates the department

23         parking lot from the Coliseum parking lot,

eb6eea52-51d4-4051-8cab-631fb47e1833

Deposition of John L. Crayton                    April 17, 2008

Page 67

1          along that fence, I parked about halfway that

2          fence.  And I got out of my car and was

3          walking diagonally across the parking lot

4          towards the covered walk that lead to the

5          breezeway to the auditorium of the

6          department.  And as I was proceeding across

7          the parking lot, I noticed the commissioner

8          and Jimmy -- what's his name.

9    Q.    Holley?  Senator Holley?

10   A.    Holley.  Jimmy Holley got out of the

11         commissioner's vehicle on the driver's side

12         and was walking around the back.  And as I

13         approached the vehicle and the sidewalk, the

14         covered sidewalk, by that time -- by the time

15         I got to the covered walk, Jimmy was standing

16         near the door, the driver's door, and the

17         commissioner was getting out.  And I had to

18         pass -- pass within two feet of them where

19         they -- where the commissioner parked.  He

20         parked in the first parking slot adjacent to

21         the entrance to the covered walk.

22              And as I passed, I spoke to them and

23         proceeded on up the walk.  You know, in

Deposition of John L. Crayton                    April 17, 2008

Page 68

1        passing as you speak, you -- you know, you

2        don't cut pace and you continue to -- Well,

3        anyway, I continued to proceed towards the

4        auditorium.

5    Q.  What did you say?

6    A.  I say, how are you-all doing?

7    Q.  Okay.  And just continued to walk?

8    A.  Right.

9    Q.  All right.

10   A.  And no one replied, so I just continued to

11       walk.  And --

12   Q.  When you say no one replied, the commissioner

13       didn't reply?

14   A.  No.

15   Q.  Senator Holley didn't reply?

16   A.  No.

17       And as I was proceeding on up the walk,

18       the commissioner said, well, John, how are you

19       doing?  You know, and I didn't -- I just

20       ignored it because I, you know, just

21       thought -- I thought, well, maybe it's a

22       delayed reaction.  And I continued to walk up

23       the walk or, you know, proceeded toward the

eb6eea52-51d4-4051-8cab-631fb47e1833

Deposition of John L. Crayton                    April 17, 2008

Page 69

1    auditorium.  And he repeated it again.  And I

2    turned around and I told him, I said, well, I

3    have spoken to you.  Didn't you hear me?  And

4    in my turning around and, you know, and they

5    were proceeding toward me, but anyway, they

6    got within, oh, a close proximity of me in my

7    walking towards the auditorium.  And as we

8    all -- we all arrived at the door of the

9    breezeway leading into the building.  And --

10   well, in the walk toward the door, the

11   commissioner wanted -- he wanted to have a big

12   dialogue.  And he did all the talking, and he

13   asked a bunch of questions as to why are you

14   acting this way and all.  And I --

15   Q.   Was this at the door?

16   A.   No, this was before we got to the door.

17   Q.   Before you got to the door.  Were you still

18        outside?

19   A.   Yeah.

20   Q.   Okay.

21   A.   And he kept verbalizing at me.  And my reply

22        to him was that you have spoken and I have

23        spoken; just let it be at that.  And I

1           proceeded on toward the door.  And when we got

2           to the door, I reached to open the door.  The

3           commissioner made a -- some sarcastic remark,

4           and I turned around and looked him in the

5           face.  And he got offended.  You know, he took

6           it as an offense, the fact that I turned

7           around and looked at him and --

8    Q.    When he had spoken to you when you heard him

9           say -- when you had walked past, and then you

10          did hear him say, John, hello?

11   A.    Yes.

12   Q.    Okay.  Did you turn around at that point or

13          did you just keep walking?

14   A.    No.  He -- When he -- when he spoke the second

15          time, I turned around.

16   Q.    What about the first time?

17   A.    No, I did not turn around.

18   Q.    You just kept walking towards the door?

19   A.    Right.

20   Q.    But when he spoke the second time, you did

21          turn around.

22   A.    Right.

23   Q.    And when you said he made this sarcastic

eb6eea52-51d4-4051-8cab-631fb47e1833

Deposition of John L. Crayton                    April 17, 2008

1        remark, what remark was that?

2   A.   Well, he had a -- he has a habit of, you know,

3        lumping folks into a group and saying you-all

4        or you people or something to that effect.

5        And I turned around and looked him in the

6        face, you know, to let him -- you know, to

7        indicate to him that I didn't like the

8        comment.

9   Q.   You didn't say anything.

10  A.   I did not say anything to him.

11  Q.   All right.  Now, prior to this incident, how

12       would you describe your relationship with the

13       commissioner?

14  A.   Prior to that incident?

15  Q.   Yeah.

16  A.   Shaky.

17  Q.   And why do you say that?

18  A.   Well, it appears as if he had a problem with

19       me as an individual.

20  Q.   Other than the reprimand of October of 2004,

21       had you ever had any other unofficial

22       reprimands from him personally?

23  A.   No.

Deposition of John L. Crayton                April 17, 2008

Page 77

1    A.    That day he was asked.

2    Q.    And where did that discussion take place?

3    A.    That occurred in the commissioner's office.

4    Q.    That's when you went to the commissioner's

5          office?

6    A.    Right.

7    Q.    Tell me what happened when you went to the

8          commissioner's office.

9    A.    Well, he insisted that I come into his

10         office.  And I go into his office, and he

11         called Jeff Webb in to tell Jeff Webb about

12         his side of the story of the incident that had

13         just occurred.  And he asked Jimmy Holley to

14         verify the facts, and Jimmy Holley verified

15         that it was the truth.  And his version of it

16         was nowhere near what had actually happened.

17   Q.    Okay.  So Mr. Holley basically supported the

18         commissioner's position.

19   A.    Right.

20   Q.    And you disagreed with that.

21   A.    Yes.

22   Q.    Did you tell Mr. Holley that?

23   A.    No, I did not.

Deposition of John L. Crayton                    April 17, 2008

Page 78

1    Q.    What did you say to Mr. Webb?

2    A.    I didn't say anything to Mr. Webb.

3    Q.    Did you say anything in that meeting?

4    A.    No.

5    Q.    How did the meeting end?

6    A.    After the commissioner gave his side of the

7          story, I was dismissed.

8    Q.    And as a result of that incident that you

9          refer to in paragraphs 21 and 22, did you

10         receive any kind of written reprimand?

11   A.    No.

12   Q.    Any kind of --

13   A.    There was a --

14   Q.    -- a written warning?

15   A.    No.  But there was a -- there was an effort

16         that was being arranged that I found out in

17         another meeting.

18   Q.    It was an effort that was being arranged.

19   A.    There was an effort to reprimand me because of

20         this incident and because of the version that

21         the commissioner gave to Jeff Webb.

22   Q.    But I thought you told me you were not

23         reprimanded.

Deposition of John L. Crayton                                April 17, 2008

Page 86

1    A.    Yes, I did.

2    Q.    And did he call Mr. Webb into his office?

3    A.    Right.

4    Q.    And then after -- what was discussed in his

5          office?

6    A.    There was no discussion.  He -- The

7          commissioner gave his version of the incident

8          and --

9    Q.    To who?

10   A.    To Jeff Webb.  And Jeff Webb made the

11         comment -- made the statement that we can't

12         have these kind of things occurring on the job

13         or something.  And I was dismissed, and I went

14         to my office.

15   Q.    Did you make any requests or say anything?

16   A.    No, I did not make any requests because I -- I

17         was in a situation where it wasn't going to

18         make a difference anyway.  So I did not, and I

19         wasn't asked to give my version.

20   Q.    Did you tell Mr. Webb or the commissioner that

21         you wanted to go contact your attorney or

22         ASEA?

23   A.    At that point?

Deposition of John L. Crayton                    April 17, 2008

Page 87

| | | |
|---|---|---|
| 1 | Q. | Yes, sir. |
| 2 | A. | After entering the office? |
| 3 | Q. | Yes, sir. |
| 4 | A. | No. |
| 5 | Q. | But after you left the office, that's when you |
| 6 | | did contact ASEA. |
| 7 | A. | I did, yes. |
| 8 | Q. | Was that incident that occurred that you refer |
| 9 | | to in paragraphs 21 and 22, was that |
| 10 | | discussed, that specific incident discussed |
| 11 | | during this meeting that you had with the |
| 12 | | commissioner and ASEA representatives? |
| 13 | A. | Yes. |
| 14 | Q. | But you didn't make any comments about it. |
| 15 | A. | No. |
| 16 | Q. | And again, you weren't reprimanded.  You |
| 17 | | didn't receive any reprimand about that |
| 18 | | incident. |
| 19 | A. | No, I didn't receive a written reprimand. |
| 20 | Q. | Written reprimand or a written warning. |
| 21 | A. | No. |
| 22 | Q. | Your pay wasn't reduced in any way. |
| 23 | A. | No. |

Deposition of John L. Crayton                    April 17, 2008

Page 95

1    Q.   And at that meeting when you were told that

2         you were being reassigned, what, if anything,

3         did you say to these individuals?

4    A.   Well, I informed them that I wasn't interested

5         in that position and, as a matter of fact, I

6         wasn't qualified due to the technical aspect

7         of that position.  I had not received any

8         formal training as far as genetic engineering

9         is concerned.  And matter of fact, that's a

10        fairly new discipline in the area of science

11        anyway.

12   Q.   It's a new and emerging discipline, correct?

13   A.   Right.

14   Q.   Would you agree it's an important position?

15   A.   It's about as important as the -- many of your

16        newer scientific areas as they have evolved

17        over the years.

18   Q.   Would you agree that it's a necessary

19        position?

20   A.   The position itself, no.

21   Q.   You would not agree that the position you

22        serve in is a necessary position.

23   A.   Now, repeat that.

Deposition of John L. Crayton                    April 17, 2008

1    developing that program where -- to -- to fill

2    the needs that they're claiming that exist,

3    due to the fact that the state of Alabama --

4    your land-grant universities in the state of

5    Alabama, they're not involved in genetic

6    engineering as it relates to agriculture in a

7    big way at all.  The money is not there.  The

8    personnel is not there.

9  Q.  Who's more qualified within the Department of

10   Agriculture to serve in that position than

11   you?

12 A.  Tom Johnson has a Ph.D. in, I think, some area

13   of plants.

14 Q.  Tom Johnson?

15 A.  Yes.  But, now, I don't know whether or not he

16   has had any curricular courses in

17   biotechnology or not.

18 Q.  Well, as the program director of that

19   particular program, I mean, don't you have the

20   ability to make the program just about what

21   you want to make it?

22 A.  My ability and expertise would leave me very

23   limited and ...

Deposition of John L. Crayton                    April 17, 2008

Page 98

1    Q.    Have you been requested to attend any seminars

2          or educational programs or anything in the

3          last two years in an effort to increase your

4          expertise in this area?

5    A.    Yes.

6    Q.    Have you attended any?

7    A.    I requested to visit Monsanto a month ago and

8          put in a travel request, and I have not

9          received a response yet.

10   Q.    Is that the first request you've made?

11   A.    Yes.

12   Q.    Have you followed up with that request at all

13         and asked anybody where -- you know, what's

14         the status of that request or anything of that

15         nature?

16   A.    I asked -- Yes.  In my staff meeting I asked

17         my supervisor to go to the meeting.

18   Q.    Who did you ask?

19   A.    Ronnie Murphy.

20   Q.    Was that conversation taped?

21   A.    No, it was not.

22   Q.    And that was about a month ago?

23   A.    The request was made a month ago.

Deposition of John L. Crayton                    April 17, 2008

Page 100

1      correct?

2  A.   Yes.

3              (Defendant's Exhibit 4 was marked for

4              identification.)

5  Q.   And when did this reassignment take effect?

6  A.   I would have to go back.  Dates ...

7  Q.   Shortly thereafter?

8  A.   Yeah.  Around August, the first of August, I

9       think it was.

10 Q.   And as a result of this position that you were

11      assigned to, was there any reduction in your

12      pay?

13 A.   No.

14 Q.   Was there any reduction in your -- It wasn't a

15      demotion, wasn't it?

16 A.   It was a lateral transfer, and I looked

17      at it -- I saw it as a demotion.

18 Q.   But it was a lateral transfer.

19 A.   Right.  And there was individuals who was

20      either promoted or transferred who got -- have

21      gotten step raises.

22 Q.   What individual are you talking about?

23 A.   Well, I know of three merit raises that were

Deposition of John L. Crayton                                    April 17, 2008

Page 102

1    A.    Ronnie Murphy and Ray Hilburn.

2    Q.    When did you make that request?

3    A.    During the time that I received this letter.

4    Q.    And what did you request?  I mean, what was

5          your request?

6    A.    Well, my request was that should -- my

7          statement that I just made, that if they

8          thought that this job was so important for the

9          state of Alabama and the Department of

10         Agriculture and they wanted me to take it and

11         I was the most qualified, I should be --

12         instead of a lateral transfer, I should be

13         given at least a two-step raise.

14   Q.    Did they have the ability to do that, to your

15         knowledge?

16   A.    Yes.

17   Q.    You did receive a vehicle as a result of this

18         transfer, correct?

19   A.    Yes.

20   Q.    Do you still have that vehicle?

21   A.    Yes.

22   Q.    You don't have any criticism about receiving a

23         vehicle, do you?

Deposition of John L. Crayton                     April 17, 2008

Page 103

1    A.    Well, I mean, I could -- I mean, I would be

2          satisfied without one.

3    Q.    Do you want to turn it back in?

4    A.    No.

5    Q.    But you'd be satisfied not to have one.

6    A.    Well, now that I have it, no.  But I would

7          have been just as satisfied had they not given

8          me one.

9    Q.    You did receive a five percent

10         across-the-board raise in September of 2006,

11         did you not?

12   A.    As did all State employees.

13               Let me take that back.  I think it was

14         three and a half.

15   Q.    I'll represent to you it was five.  Well, let

16         me just show you.  Let me mark this.

17               (Defendant's Exhibit 5 was marked for

18               identification.)

19   Q.    Show you what I've marked as Defendant's

20         Exhibit 5.  It looks like you got a five

21         percent across-the-the-board raise.

22   A.    This is -- Yeah.  This was a two-step raise

23         for the -- a merit raise, right.

Deposition of John L. Crayton                    April 17, 2008

Page 104

1    Q.    That you got in September of 2006.

2    A.    Right.

3    Q.    After you were reassigned to the position as

4          program director of the genetically modified

5          seed plant.

6    A.    Right.

7    Q.    Okay.

8    A.    But, now, this was after the fact that I

9          was -- I had to contend for that because of

10         the fact that it was Ronnie Murphy's effort to

11         give me less than a -- a mediocre evaluation.

12         And he attempted to evaluate me for a year,

13         for a twelve-month period, and which he had

14         not supervised me for a twelve-month period,

15         and that I had to contend with him and the

16         personnel director, the person in charge of

17         personnel in the department.  But --

18   Q.    But it didn't affect -- it didn't affect your

19         pay grade and it didn't affect your pay raise,

20         did it?

21   A.    No, it didn't.

22   Q.    Okay.  And while I'm thinking about it, the

23         vehicle that you've been assigned since you

Deposition of John L. Crayton                                April 17, 2008

Page 105

1          took this position in the last two years, what

2          trips have you taken in that vehicle?

3     A.   I've gone to Auburn a number of times.

4     Q.   How many times would you say you have been

5          over to Auburn?

6     A.   Oh, about three times.

7     Q.   In two years.

8     A.   Right.

9     Q.   Have you been anywhere else?

10    A.   No, I have not.

11    Q.   Well, just while we're talking about raises,

12         let me show you what I'm going to mark as

13         Defendant's Exhibit 6.  This is a letter dated

14         May 24 of '07 to you, Mr. Crayton, from Teresa

15         Brunson talking about a raise.  And it looks

16         like you got -- effective September 1 of 2007

17         you got a three and a half percent raise.

18                    (Defendant's Exhibit 6 was marked for

19                     identification.)

20    A.   That was an across-the-board raise.

21    Q.   Yeah.

22    A.   I mean, that was a cost-of-living raise that

23         all State employees got.

eb6eea52-51d4-4051-8cab-631fb47e1833

1    Q.    Yeah.  And it shows you're now at a step 16.

2    A.    I can't remember what the step is, but yeah.

3    Q.    Well, it shows you're a 16 on the second

4          page.  Do you see that?

5    A.    Okay.  Yeah.

6    Q.    So in September of 2007 you received another

7          pay increase and a step increase.

8    A.    Yes.

9    Q.    And looking again at your amended complaint

10         there --

11                    MR. WILSON:   Juraldine, on page 9.

12                    MS. BATTLE-HODGE:   Okay.

13   Q.    -- is it your contention that you were placed

14         in this position as program director of the

15         genetically modified seed plant as a result of

16         some kind of harassment or discrimination?

17   A.    Yes.

18   Q.    What do you base that on?

19   A.    This -- If you go back in -- Well, looking at

20         the historical aspect of racism and how blacks

21         have been discriminated against over the

22         years, it's not as blatant now as it was.

23   Q.    I understand.

eb6eea52-51d4-4051-8cab-631fb47e1833

Deposition of John L. Crayton                    April 17, 2008

Page 107

1    A.    And this was an -- in an effort to try to make

2          me angry or discourage me to leave the

3          department.

4    Q.    You've got 30 years in with the State

5          Department of Agriculture, don't you?

6    A.    Yes.

7    Q.    I mean, you could retire today, right --

8    A.    Yes, I could retire today.

9    Q.    -- if you wanted to?

10         Did you participate in the DROP program?

11   A.    Yes, I did.

12   Q.    Have you completed that?

13   A.    I complete that this year.

14   Q.    Yeah.  So if you retired today, how much money

15         would you get from the DROP program, just a

16         ballpark?

17   A.    Well, I don't wish to divulge that.  I think

18         that's personal, and I think that ...

19   Q.    Well, let me ask you this.  It would be a

20         substantial sum of money, wouldn't it?

21   A.    More than I would have -- I mean, yeah, it

22         would be.

23   Q.    And when you were reassigned, there was no

Deposition of John L. Crayton                  April 17, 2008

Page 108

1          reduction in pay.

2     A.   No.

3     Q.   And actually you got a raise within a couple

4          of weeks.

5     A.   Well, and that -- Well, that raise has nothing

6          to do with my being --

7     Q.   Reassignment.

8     A.   Right.

9     Q.   I follow you.

10    A.   It was the work that I had done as the program

11         director of the seed lab.

12    Q.   Right.  You weren't penalized in any way by

13         taking the position, though.

14    A.   Yes, I was penalized by transfer -- being

15         laterally transferred without giving a

16         monetary enticement to take the job --

17    Q.   Okay.  You say --

18    A.   -- if they claim that it was so important and

19         so necessary for the department.

20    Q.   So you say you were penalized because you

21         didn't receive any additional increase.

22    A.   Well, whites and the -- the ones that I'm

23         aware of, Benny Hitch was promoted, and he was

Page 109

1              promoted to substantially above his pay that

2              he was -- I mean, the pay grade that he was in

3              prior to his promotion.

4        Q.    All right.  Benny Hitch.  Let's stay with

5              him.  Benny Hitch was in what position at that

6              point?

7        A.    He was unit manager, I think.

8        Q.    All right.  Is that above a program director?

9        A.    No, it's not.

10       Q.    All right.  And what was he promoted to?

11       A.    He was promoted to a program director.

12       Q.    Okay.  And when you're promoted from a unit

13             manager to a program director, that's a step

14             up in pay automatically, correct?

15       A.    Correct.

16       Q.    Right.  But in your situation, yours was a

17             lateral transfer, correct?

18       A.    Correct.

19       Q.    Has anybody at the -- well, not anybody.  Let

20             me ask that again.  Has anybody that's your

21             supervisor asked or demanded that you retire?

22       A.    No.

23       Q.    Has the commissioner?

eb6eea52-51d4-4051-8cab-631fb47e1833

1    A.   Well, he had -- he had implied that if I did

2         not take the job that we would have to part

3         company.

4    Q.   But he didn't say you need to retire or you

5         need to resign or anything like that.

6    A.   Well --

7    Q.   I mean, he didn't say that to you, did he?

8    A.   But -- Well, his -- his comment to me that if

9         I did not take the job that it would -- that

10        we would have to part company, that was enough

11        for me right there.

12   Q.   But he did not tell you that you needed to

13        retire or you should retire.

14   A.   No.

15   Q.   Look on page 11 real quick at just paragraph

16        five.  You stated that you were reassigned to

17        an office with no chair and that this was an

18        attempt by the defendant to embarrass or

19        harass you.

20             MS. BATTLE-HODGE:  You said five?

21             MR. WILSON:  35.  Sorry.

22             MS. BATTLE-HODGE:  I'm sorry.

23   Q.   See there?  What's that all about?

Deposition of John L. Crayton                          April 17, 2008

Page 111

1    A.    Well, if they're going to reassign you to an

2          office, wouldn't you think that it was their

3          responsibility to make sure that at least it

4          had office furniture?

5    Q.    Well, how long were you without any office

6          furniture?

7    A.    Well, I carried the furniture that I had in my

8          office, my current office, back there.

9    Q.    Well, I mean, you're a program director.  If

10         you were going from one office to another, if

11         you had an office chair, you could just take

12         it with you, couldn't you?

13   A.    Had a desk and chair.

14   Q.    Okay.  Is that what you did?

15   A.    Yes.

16   Q.    When you say it was an attempt by the

17         defendant to embarrass you or intimidate you,

18         who is the defendant you're referring to?

19   A.    Well, the --

20   Q.    Who are you referring to?

21   A.    Ron Sparks, Ronnie Murray.

22   Q.    Isn't it a fact that Mr. Murphy told you that

23         you could order whatever furniture or computer

eb6eea52-51d4-4051-8cab-631fb47e1833

Deposition of John L. Crayton                    April 17, 2008

Page 112

1        or equipment that you needed for that new

2        office?

3   A.   No.

4   Q.   He never told you that you could get what you

5        need or if you needed something to let him

6        know or anything of that nature?

7   A.   Well, the comment -- that was a meeting prior

8        to my move that Ron Sparks and Ronnie Murphy

9        came to my office late one evening.  This was,

10       oh, five minutes till five.  Insisted -- Well,

11       Ronnie Murphy came down about five of five

12       asking me -- telling -- informing me that the

13       commissioner wanted to see me in his office.

14       And I had an engagement at 5 o'clock that I

15       needed to go to, and I informed Ronnie Murphy

16       of that fact.

17            And he left my office and came back along

18       with the commissioner, and then they came in

19       and we had a short meeting.  And he -- in the

20       conversation, I informed them of my desire not

21       to take the position and that -- that -- you

22       know, informed them of all of my reservations

23       concerning the position and let them -- And

Deposition of John L. Crayton                    April 17, 2008

Page 113

1          Ron Sparks made the statement saying that the

2          only reason why I wouldn't succeed in the

3          position was that I wouldn't -- I didn't -- I

4          would fail to ask for the things that I

5          needed.

6               And I think it was a week later I sent

7          the commissioner and Ronnie Murphy a list of

8          the things that I needed for the office and

9          the position, and I have not received a

10         response from the commissioner yet.  And the

11         memo was to the commissioner.

12    Q.   Have you got a copy of that memo?

13    A.   No, I don't have -- Yeah, I have a copy, but I

14         don't have it with me.

15    Q.   And what was contained within that memo?  What

16         did you request?

17    A.   I requested to be returned back to my previous

18         position.  I requested that if they -- if I

19         was to be successful in the position that

20         there were certain things that I needed.

21    Q.   What were those things?

22    A.   That was office supplies, computers.

23    Q.   Have you got a computer today?

eb6eea52-51d4-4051-8cab-631fb47e1833

Page 114

1    A.    Yes, I do have a computer.

2    Q.    Okay.  Have you got office supplies?

3    A.    I do have office supplies.

4    Q.    What else was in it?

5    A.    I requested an assistant and a secretary.

6    Q.    An assistant and a secretary?

7    A.    Right.

8    Q.    Do you have any staff?

9    A.    No, I don't have any staff.

10   Q.    If you need secretarial-type work done, how

11         does it get done?  Do you do it yourself?

12   A.    I do it myself.

13   Q.    Is there any equipment or office furnishings

14         that you contend that you do not have that

15         prevent you from doing your duties?

16   A.    No, I -- Office equipment or furniture, no.

17         But I do need an assistant and a secretary.

18   Q.    If you had an assistant, what would that

19         assistant do?

20   A.    Would assist me in reviewing literature,

21         organizing it in such a way that it can be

22         retrieved or it can be referred to or draw

23         conclusions from.  The amount of material out

Deposition of John L. Crayton                    April 17, 2008

1      there, I mean, it's so vast, one person could

2      not grasp and retain it that have not received

3      formal training.  And it's just a situation

4      where that that individual -- one individual

5      cannot do what they're claiming that they need

6      or what they -- you know, what the job will

7      entail if there was going to be a -- if they

8      were going to do us a good job in

9      accomplishing what they -- what the

10     administration say that they want, expecting

11     out of us.

12   Q.   Other than that one memo, have you sent any

13        other memos or requests?

14   A.   No, I have not.

15   Q.   We've gone through most of the allegations

16        contained in your amended complaint, the

17        factual allegations, paragraphs one through

18        38.  Have you told me about every incident or

19        all the basis for your racial discrimination

20        claims?

21   A.   No.

22   Q.   What else do you contend or how else do you

23        contend you have been discriminated based on

Deposition of John L. Crayton                    April 17, 2008

Page 118

1          the purchase requests myself.  Here again, you

2          know, an employee out of another office is

3          going to come and try to tell the secretary of

4          the -- in my office as to what she should and

5          shouldn't do.

6               These were, you know, little incidents

7          that I have reference to -- well, is an

8          example of the incidents that I'm referring

9          to.

10    Q.   Well, what you're referring to, you received a

11         warning in May of 2005 from Mr. Hester

12         concerning a failure to follow rules and

13         directives.  Do you remember that?

14    A.   Yes.  Uh-huh (positive response).

15    Q.   Is that what you're talking about, some of

16         that?

17    A.   Some of those things are in there, yes.

18    Q.   Right.  And that was back in May of 2005 is

19         when you got the warning.  So those things

20         occurred before that, right?

21    A.   Right.

22                       (Defendant's Exhibit 7 was marked for

23                        identification.)

Deposition of John L. Crayton                    April 17, 2008

Page 119

1    Q.    All right.  I'll just show you what I've

2          marked as Defendant's Exhibit 7.  Is that a

3          copy of that warning dated May 11th, 2005?

4    A.    Yes.

5    Q.    And that warning reflects the incidents that

6          you were telling me that you perceived to be

7          racial discrimination on the part of the

8          department or their employees against you.

9    A.    Yes.

10   Q.    Okay.  You claim in your claim for racial

11         discrimination that you were retaliated

12         against because you filed a complaint with the

13         State Employees Association in June of 2006.

14         Have you told me everything that's the basis

15         of that complaint?

16   A.    No.  I'm sure that I haven't, no.

17   Q.    Well, did you actually file a complaint with

18         the ASEA or did you just talk to them?

19   A.    I filed an EEOC complaint.

20   Q.    Right.  You did that, I think, sometime in

21         September of 2006.

22   A.    Right.

23   Q.    And was that complaint filed primarily because

Deposition of John L. Crayton                         April 17, 2008

1    Q.    You've had four different supervisors?

2    A.    Yes.

3    Q.    And who have they been?

4    A.    Wilma Fitzpatrick, Lance Hester/Doug Rigney,

5          Ronnie Murphy, and Ray Hilburn.

6    Q.    And Mr. Hilburn is your supervisor now.

7    A.    No, Ronnie Murphy is my supervisor.

8    Q.    Ronnie Murphy is still your supervisor.  Okay.

9          But again, just to be clear, the

10         reprimand you were referring to was the

11         reprimand from October of 2004.

12   A.    Right.

13   Q.    That's the only reprimand you've ever

14         received.

15   A.    Right.

16   Q.    Okay.  You make a claim for back pay and

17         fringe benefits.  Do you contend that you have

18         lost any pay or fringe benefits as a result of

19         any of your claims?

20   A.    My -- The reprimand, I lost a step raise, and

21         that's what I was requesting in that.

22   Q.    Did you lose anything else?

23   A.    No.

Deposition of John L. Crayton                    April 17, 2008

Page 122

1    Q.    Have you been treated by any physician,

2          psychologist, or psychiatrist for any of the

3          claims that you're making in this case

4          specifically?

5    A.    I was -- I was sent to a psych -- I was

6          referred to BHS.

7    Q.    Right.  I'm going to ask you about that.  But

8          I'm just talking about on your own, have you

9          sought any medical treatment for any

10         condition?

11   A.    Had no need to, no.

12   Q.    Okay.  And I'm going to get into your second

13         claim in just a minute, but I just want to be

14         sure -- I just want to be sure that, you know,

15         as we sit here today, do you contend that the

16         position that you're now serving in is an

17         important position?

18   A.    It is a position that can be useful for the

19         Department of Agriculture and for the state of

20         Alabama, but not necessary.

21   Q.    All right.  But you're the head of that

22         program, correct?

23   A.    Yes.  Yes.

Deposition of John L. Crayton                    April 17, 2008

Page 123

1    Q.    I mean, you're the head of it, right?  You're

2          running it, right?  You'll agree with me on

3          that, won't you?

4    A.    Yes.

5    Q.    And you'll at least agree that if you're not

6          the most qualified, you're one of the most

7          qualified people in the department to run it.

8    A.    I would -- Yes, one qualified person.

9    Q.    I mean, you agree you're qualified to run it,

10         do you not?

11   A.    If the job was announced and specs was written

12         for that job, I would qualify.

13   Q.    And you have been furnished a State vehicle.

14   A.    Yes.

15   Q.    You've received all your merit raises.

16   A.    Yes.

17   Q.    You've had the opportunity to travel and meet

18         the industry and attend workshops and

19         conventions and meetings.

20   A.    Yes.

21   Q.    You have been given that opportunity.

22   A.    Yes.

23   Q.    And you have a vehicle to do it in.

Deposition of John L. Crayton                    April 17, 2008

Page 124

1    A.    Yes.

2    Q.    Okay.  But I think you told me earlier you

3          really haven't been to any meetings.  You've

4          got one set up to go to Monsanto.

5    A.    And I haven't received -- And this -- the

6          request was made a month ago.

7    Q.    Right.

8    A.    Now, going into this job with -- with a lack

9          of experience and formal education, I have to

10         bone up on my own to find out -- to get at a

11         position where I could sit down and talk with

12         individuals, specialists in the area of

13         genetic engineering about engineering.

14   Q.    All right.  You've told me earlier, I mean,

15         this is an emerging area.  I mean, genetics

16         are a new thing, an emerging thing?

17   A.    Well, genetics is not, but --

18   Q.    Right.  But ...

19   A.    -- many of the techniques that they are using

20         in genetics or studying genetics are new.

21   Q.    And do you see -- I mean, in your position, do

22         you see that this will be more and more

23         critical as time goes by?  I mean, isn't this

Deposition of John L. Crayton                              April 17, 2008

1        where the industry is headed?

2    A.   Yes.

3    Q.   I mean, you'll have to forgive me because I'm

4        not a farmer.  But, you know, in the industry,

5        they're always out there trying to improve the

6        quality of seed, the type of seed, you know,

7        improve the crop, and that kind of thing, I

8        mean, for disease resistance and what have

9        you, correct?

10   A.   Yes.

11   Q.   And that's ongoing, right?

12   A.   Yes, it is.

13   Q.   That's the science that you deal with.

14   A.   Yes.

15   Q.   And to do that will benefit the farmers of the

16       state of Alabama.

17   A.   Yes.

18   Q.   Isn't that the bottom line?

19   A.   Yes.

20   Q.   And in your position, that's who you're trying

21       to help.

22   A.   In my position, I'm not in a position to help

23       the farmers, per se.

Deposition of John L. Crayton                    April 17, 2008

1     Q.    Why do you say that?

2     A.    In the sense that we are not -- we're not

3           developing or doing research and development.

4     Q.    Could you in your position do that?

5     A.    No.

6     Q.    Why not?

7     A.    I informed you that I don't have the formal

8           education.  I don't have the formal education

9           that is required, and the State of Alabama has

10          not -- don't have -- has not put the money

11          into the land-grant schools to do it.  They

12          don't have the personnel to do it.  See, your

13          land-grant universities don't have the

14          personnel to do it.

15    Q.    Have you done anything to try to improve your

16          personal educational level in the last five

17          years in this area?

18    A.    I was not -- No.  In the last year and a half

19          to two years, I've been doing a great deal of

20          reading.

21    Q.    Just research on your own --

22    A.    Right.

23    Q.    -- during the course of your job?

eb6eea52-51d4-4051-8cab-631fb47e1833

Page 127

1    A.    Right.

2                   MR. WILSON:  Let me take just a

3                   second.

4                   (Brief recess.)

5    Q.    (Mr. Wilson continuing) I'm looking at your --

6                   MS. BATTLE-HODGE:  This one?  This

7                   one?

8                   MR. WILSON:  Yes.

9    Q.    -- the complaint, the second complaint that

10         was actually filed.  It's been consolidated.

11         But anyway, you make a reference there on page

12         3 that you filed another EEOC complaint on May

13         3, 2007, right?

14   A.    Uh-huh (positive response).  Yes.

15   Q.    Let me ask you this.  When you filed the first

16         EEOC complaint back in I think September of

17         2006, did you talk with anybody before you

18         filed that complaint?

19   A.    No.

20   Q.    You just filed that on your own?

21   A.    Yes.

22   Q.    Did you go to Birmingham to file that

23         complaint?

Deposition of John L. Crayton                    April 17, 2008

Page 133

1    Q.    You state in here in this paragraph nine that

2          on November the 14th that you were ordered to

3          meet with Ronnie Murphy.  He was your

4          supervisor at that time.  And that at this

5          meeting he mandated that you contact the

6          Behavioral Health System coordinator.  Do you

7          recall that meeting?

8    A.    Right.

9    Q.    What brought that on?

10   A.    Well, he had -- he informed me that he had

11         received a letter from general service,

12         Pete -- I can't think of his last name -- that

13         one of his -- one of the employees that he

14         supervised had come to him complaining to him

15         about an incident that had occurred between

16         the two of us.

17   Q.    And who was that employee?

18   A.    Reba Stabler.

19   Q.    And who is Ms. Stabler?

20   A.    She's the young lady that works in procurement

21         that I had reference to earlier.

22   Q.    And is she white or black?

23   A.    She's white.

eb6eea52-51d4-4051-8cab-631fb47e1833

Deposition of John L. Crayton                        April 17, 2008

Page 134

1    Q.    All right.  And was there an incident between

2          you and Ms. Stabler?

3    A.    Yes.

4    Q.    When did that occur?

5    A.    Dates, I don't recall the date right offhand.

6    Q.    What year are we talking about?

7    A.    That was last year.

8    Q.    Would this have been in '06?

9    A.    Yes.

10   Q.    It would have been in '06 because -- I mean,

11         before the meeting of November of '06, right?

12               MS. BATTLE-HODGE:  Yeah, you met

13                    November '06.

14   A.    Yes.  Uh-huh (positive response).

15   Q.    And tell me about this incident between you

16         and Ms. Stabler.

17   A.    I was coming in the building one morning, and

18         I had my hands full.  I had a -- And I had my

19         key out to unlock the door to come in.  And

20         before I realized it, the door was flying back

21         in my face, and I backed up.  And had I not

22         backed up, the door would have hit me in the

23         face.

Deposition of John L. Crayton                    April 17, 2008

Page 135

1        But anyway, she was pushing the door back

2    out on me.  And her claim was that she was

3    trying to help me, you know, this -- well, on

4    this particular morning.  Times past that the

5    individuals go in the door and just let the

6    door slam in your face, you know, and you were

7    responsible for unlocking the door or pulling

8    it open yourself.  But it was -- I found it

9    strange this particular morning that she's

10   making an attempt to help me, you know.  I

11   found it kind of strange.

12   Q.  Why would you find it strange?

13   A.  Well, times past, you know, I would come in

14   behind her or some other individuals, and

15   they -- they would, you know -- But I was in

16   the habit of coming in myself, you know,

17   letting myself in without any assistance.

18   Q.  But on this occasion you had your hands full?

19   A.  Well, I had the hands full, but I wasn't -- I

20   mean, I wasn't incapacitated where I couldn't

21   get in the door.

22   Q.  Okay.  Well, did you say anything to

23   Ms. Stabler?

Deposition of John L. Crayton                          April 17, 2008

Page 136

1    A.    Well, she said that she was trying to help

2          me.  And I told her, I said, well, I'll -- you

3          know, go ahead on and I'll get -- you know,

4          I'll help himself.  Because it kind of vexed

5          me the fact that she was, you know, pushing

6          the door out on me, you know.

7    Q.    Did you comment to her in some kind of rude

8          or -- way?

9    A.    No.  I asked her to go -- I know my -- my

10         comment to her was to go ahead on; you know,

11         I'll let myself in.  And she was insisting on,

12         you know, having this dialogue with me.  And

13         after a point, you know, I told her -- I just

14         let her know that I didn't appreciate her

15         pushing the door out in my face.

16   Q.    So you didn't perceive her as trying to help

17         you.

18   A.    No.

19   Q.    Do you think she was intentionally trying to

20         push the door on you?

21   A.    I don't know what her intention was, but I

22         didn't see it as her trying to help me.

23   Q.    Were there any other incidents referred to in

eb6eea52-51d4-4051-8cab-631fb47e1833

Deposition of John L. Crayton                    April 17, 2008

Page 137

1          this meeting on November 14th?

2     A.   No.

3     Q.   Well, what's your understanding of, then,

4          other than the incident with Ms. Stabler, why

5          you were referred to the Behavior Health

6          System coordinator?

7     A.   Well, I had stopped being -- Well, I had

8          removed myself from being in a social setting

9          with the individuals that I saw as -- as, you

10         know, having a -- having a bone to pick with

11         me or individuals that I associated with, and

12         so I -- I kept mainly to myself.

13    Q.   And those individuals you're talking about,

14         are they white individuals?

15    A.   Well, some of them were black.

16    Q.   Who were some of the black employees that you

17         had no contact with?

18    A.   That I wouldn't associate with?

19    Q.   Yeah.

20    A.   Well, I didn't spend much -- I didn't spend

21         any time around George Paris, George Baldwin

22         or Angela -- I can't think of her -- Angela

23         Hurst, Daniel Robinson.

Page 145

1          go.

2     Q.   And who was the psychiatrist that you saw?  Do

3          you remember?

4     A.   Offhand I don't remember.

5     Q.   It looks like you saw a Clinton Smith?

6     A.   Yes, that's ...

7     Q.   And would have seen him on December 5 of 2006?

8     A.   Yes.

9     Q.   Where is his office located?

10    A.   Off of Taylor Road there near Taylor Road

11         Baptist Church and the park there across from

12         Halcyon.

13    Q.   And did you see Dr. Smith only on one

14         occasion?

15    A.   Yes.

16    Q.   And for how long?

17    A.   About an hour.

18    Q.   And what was discussed during that session?

19    A.   Well, he asked me to --

20                    MS. BATTLE-HODGE:  I'm going to

21                        object because ...

22                    MR. WILSON:  Well, y'all have

23                        produced the records.  I mean, I

Deposition of John L. Crayton                    April 17, 2008

Page 148

1       this.  How would he know that other than what

2       you told him?

3   A.  Well, in the session that we -- his statement,

4       his final statement was that it appeared to

5       have been a personal vendetta between Ronnie

6       Murphy, Ron Sparks, and myself.

7   Q.  Based on what you told him, correct?

8   A.  Yes.

9   Q.  I mean, he didn't talk to anybody else, did

10      he?

11  A.  No, he didn't.

12  Q.  Didn't talk to Commissioner Sparks.

13  A.  Not to my knowledge.

14  Q.  Didn't talk to anybody else at the Department

15      of Agriculture to your knowledge, did he?

16  A.  To my knowledge, he didn't.

17  Q.  Now, as a result of being referred to the

18      psychiatrist in November of 2006, you didn't

19      receive a demotion, did you?

20  A.  No, I did not.

21  Q.  Didn't receive --

22  A.  Mental anguish and --

23  Q.  Didn't receive a reduction in benefits, did

Deposition of John L. Crayton                    April 17, 2008

Page 149

1       you?

2    A.    No, I did not.

3    Q.    You still have your State vehicle, don't you?

4    A.    I do.

5    Q.    But you said you had mental anguish?

6    A.    Yeah.

7    Q.    Okay.  As a result of being referred to the

8          psychiatrist?

9    A.    Well, when your -- your mental health is at

10         question and you know that there's nothing

11         wrong with you mentally, I mean, you're

12         normal, and put that in quotes (indicating),

13         to the extent of what is normal.

14   Q.    Who knew you were going to see this

15         psychiatrist other than Mr. Murphy?

16   A.    I think I mentioned it to Wilma and Shannon in

17         passing.

18   Q.    So you told Ms. Fitzpatrick that you were

19         going to see the psychiatrist; is that

20         correct?

21   A.    I may have -- what I'm trying -- I may have

22         mentioned it in passing or in -- during the

23         lunch hour that ...

eb6eea52-51d4-4051-8cab-631fb47e1833

Deposition of John L. Crayton                          April 17, 2008

Page 151

1      says, and I'll show it to you, on page 2, it

2      looks like -- Well, first of all, this

3      handwriting on page 2, that's not your

4      handwriting, is it?

5   A.   No.  That's his handwriting.  That's the

6      doctor's handwriting.

7   Q.   All right.  And it says:  I do not recommend

8      follow-up treatment.  Was that your

9      understanding?

10  A.   Yes.

11  Q.   And he says:  There appears to be an

12      interpersonal problem with Mr. Crayton and his

13      supervisor, Ronnie Murphy, and Commissioner

14      Sparks.  Mr. Crayton alleges promotion

15      discrimination and makes a claim with EEOC and

16      ASEA.  And then it says:  Mr. Crayton refused

17      to sign the supervisory referral authorization

18      form.

19  A.   My refusal was that I was going to get legal

20      advice before I signed that.

21  Q.   Right.  You never signed it, did you?

22  A.   No, I didn't.

23  Q.   But you did go to the referral.

Deposition of John L. Crayton                        April 17, 2008

Page 152

1    A.    I did.

2    Q.    And as far as you know, Dr. Smith's comments

3          here on page 2 are based on what you told him

4          in the session.

5    A.    I would assume so, yes.

6    Q.    Because to your knowledge he didn't talk to

7          anybody else.

8    A.    To my knowledge, no.

9    Q.    And did you tell him that you had already

10         filed an EEOC complaint?

11   A.    Yes, I did.

12   Q.    And then, of course, after you were referred

13         to the psychiatrist, you filed another EEOC

14         complaint.

15   A.    Yes, I did.

16   Q.    Did you go back to Birmingham to file that

17         one?

18   A.    I did.

19   Q.    Did you meet with the same investigator --

20   A.    No.

21   Q.    -- or another one?

22   A.    Another one.  Well, I didn't meet with the

23         investigator.  I met with the analyst that

Deposition of John L. Crayton                    April 17, 2008

Page 153

1          took the complaint.

2     Q.   Okay.  A different analyst?

3     A.   Yes.

4     Q.   And did you produce any documents to the EEOC

5          on that occasion?

6     A.   Those documents there.

7     Q.   Just -- Did you give them a copy of the --

8          Dr. Smith's assessment?

9     A.   Yes.

10    Q.   And the referral form?

11    A.   Yes.

12    Q.   And to your knowledge did the EEOC investigate

13         your claim?

14    A.   I would assume that they did.  In their reply

15         to me, they didn't find any of their laws

16         being violated.

17    Q.   The same finding that they did in your first

18         EEOC complaint; is that correct?

19    A.   Right.

20    Q.   Let me ask you real quick.  In the prosecution

21         of your EEOC claims or these lawsuits that

22         we're here about today, have you incurred any

23         expense yourself?

Deposition of John L. Crayton                    April 17, 2008

1    Q.    Is that Mrs. Battle-Hodge?

2    A.    Yes.

3    Q.    You state in here on it's paragraph 10, that

4          you were continued -- the defendant continued

5          to harass you after you filed your initial

6          EEOC complaint.  What do you base that

7          statement on?

8    A.    That document right there (indicating).

9    Q.    The referral?

10   A.    Right.

11   Q.    Anything else?

12   A.    Well, that was base -- yes -- No.  That was

13         the basis of it.

14   Q.    The referral to the --

15   A.    Right.

16   Q.    -- psychiatrist.

17   A.    Uh-huh (positive response).

18   Q.    All right.

19   A.    Oh, and my evaluation, my yearly evaluation

20         that they did not do --

21   Q.    Right.  You say --

22   A.    -- on time.

23   Q.    -- that your evaluation was due April 30th of

Deposition of John L. Crayton                    April 17, 2008

Page 156

| | | |
|---|---|---|
| 1 | | 2007? |
| 2 | A. | It was due by the end of the month, yes, the |
| 3 | | end of April, yes. |
| 4 | Q. | Has that evaluation been done? |
| 5 | A. | Yes, it has been done. |
| 6 | Q. | And when was it done? |
| 7 | A. | I would have to go back and look at the date. |
| 8 | | I don't remember.  It was sometime in May. |
| 9 | Q. | Sometime in May of '07? |
| 10 | A. | Yes. |
| 11 | Q. | And as a result of the evaluation being done |
| 12 | | in May of '07, you didn't lose any -- there |
| 13 | | was no reduction in pay, was there? |
| 14 | A. | No. |
| 15 | Q. | No demotion? |
| 16 | A. | No. |
| 17 | Q. | Didn't miss out on any raises. |
| 18 | A. | No. |
| 19 | Q. | Your only complaint is that it wasn't done by |
| 20 | | the end of April of '07?  Is that what the |
| 21 | | complaint is? |
| 22 | A. | My complaint was that it wasn't done on time |
| 23 | | and my chances of not getting my raise.  That |

Deposition of John L. Crayton                    April 17, 2008

Page 157

1        was what -- the reason why I filed the EEOC

2        complaint in the first place.

3    Q.  Right.  But you got your raise.

4    A.  I did.

5    Q.  Okay.  So there really wasn't any retaliation

6        based on that, was there?

7            Won't you agree, I mean, nobody

8        retaliated against you because your

9        performance evaluation wasn't completed on

10       April 30th of 2007?  It was completed and you

11       got your raise.

12   A.  I did -- I was evaluated and I did get my

13       raise, but --

14   Q.  So there was no retaliation on that issue, was

15       there?

16   A.  On that particular issue, no.

17   Q.  Okay.  Thank you.

18           Who did that evaluation?  Was that Mr. --

19   A.  It was done -- It was a three-part evaluation.

20   Q.  Right.

21               (Defendant's Exhibit 8 was marked for

22               identification.)

23   Q.  I'm just going to show you what I marked as

Deposition of John L. Crayton                          April 17, 2008

Page 167

1    Q.    Did you --

2    A.    -- or that I'm aware of.

3    Q.    I'm sorry.

4          Did you send that document to anybody

5          yourself?

6    A.    No.

7    Q.    Do you have any written or recorded statements

8          from any witnesses or anybody that may be a

9          witness in this case?

10   A.    No.

11   Q.    Back around the time that you were referred to

12         the psychiatrist, was there an occasion where

13         you had reported to your supervisor or to

14         Mr. Murphy or anyone at the Department of

15         Agriculture that you weren't going to speak to

16         white individuals?

17   A.    No.

18   Q.    Okay.  Did you have discussions with

19         Mr. Murphy where you made a representation

20         that you thought he and the commissioner were

21         Klansmen without hoods or something to that

22         effect?

23   A.    In discussion I may have.

Deposition of John L. Crayton                    April 17, 2008

Page 169

1    A.    Jim Kelly, that was the name that I was trying

2          to remember.  That was a kosher -- a

3          relationship.  He would call and -- seeking

4          information, and we would pass the, you

5          know, in -- you know, in relation to giving --

6          you know, sharing information with him, but

7          there was no social contact with him.

8    Q.    What about Scott Morgan?

9    A.    Scott Morgan, I knew him in attending the

10         seedmen's meeting, but there was no ...

11   Q.    How often would you attend a meeting of the

12         Alabama Seedsmen?

13   A.    Once a year.

14   Q.    And when you would go, would other members of

15         the department go with you or would you just

16         go by yourself?

17   A.    I went by myself.

18   Q.    Do you have an interest in going back to your

19         previous position as we sit here today?

20   A.    Well, at this point in time, I'm not sure.

21   Q.    Were you told when you were assigned your --

22         the position that you hold today that it was a

23         good opportunity for you and that you had an

Page 170

1          opportunity to develop a program for the

2          state?

3     A.   I may have been told that.

4     Q.   Other than this lawsuit or these lawsuits that

5          we're here about today, have you ever filed

6          any other lawsuits, civil lawsuits?

7     A.   No.

8     Q.   Have you ever been sued yourself?

9     A.   No.

10    Q.   What about your wife, has she ever been a

11         plaintiff in a lawsuit to your knowledge?

12    A.   Yes.

13    Q.   What kind of lawsuit has she filed?

14    A.   She was injured on an airline.

15    Q.   I'm sorry?

16    A.   She was injured on an airline.

17    Q.   A personal injury case?

18    A.   Right.

19    Q.   Anything else to your knowledge?

20    A.   No.

21    Q.   Has she ever filed an EEOC complaint to your

22         knowledge?

23    A.   She's filed one locally on the campus.  Auburn

Deposition of John L. Crayton                    April 17, 2008

Page 173

1    Q.    Okay.  And then you've had at least two

2          situations where you've become argumentative

3          with Mr. Murphy and where you made the comment

4          about --

5    A.    No, that wasn't an argument.  That was in a

6          conversation.  We was -- He had called me --

7          called me to his office and said he wanted to

8          talk with me.  And then we sat down and he

9          said -- well, he informed me that we were

10         going to just talk.  And he was asking me my

11         opinion, and I was giving him my opinion.

12   Q.    And that's when you told him you thought that

13         he and some of the other supervisors and the

14         commissioner were Klansmen without robes and

15         sheets?

16   A.    Well, in the heat of the conversation that --

17         and in my perception of the racial conditions

18         in the department, yes.

19   Q.    Right.  But I'm just -- that's what you said.

20   A.    I may have said that, yes.

21   Q.    All right.  And then it was after this that

22         you had the meeting on November 14th with

23         Mr. Murphy, correct?

eb6eea52-51d4-4051-8cab-631fb47e1833

Deposition of John L. Crayton                    April 17, 2008

Page 174

1    A.    Now, what -- when --

2    Q.    I'm saying after that conversation, after the

3          two run-ins with the two white females --

4    A.    Okay.  Yes.

5    Q.    -- and after your discussions with Mr. Murphy

6          where you made the comment about the Klansmen,

7          then on November 14th you had the meeting with

8          Mr. Murphy.

9    A.    That's when -- when he referred me to BHS.

10   Q.    Right.

11   A.    Okay.  Yes.

12   Q.    And, actually, that's the Employee Assistance

13         Program, right?

14   A.    Right.

15   Q.    And did you go to the Employee's Assistance

16         Program and meet with someone?

17   A.    I was to contact them, and I did.  And they --

18         And I think in the meantime, the personnel

19         person in the department had made contact with

20         them.

21   Q.    Okay.

22   A.    And when I contact BHS, they gave me the name

23         of a psychiatrist that I was to go see.

Deposition of John L. Crayton                          April 17, 2008

Page 175

1    Q.    So that it was the Employee --

2    A.    And I contacted the psychiatrist and set up an

3          appointment to see him.

4    Q.    Right.  So it was the Employment Assistance

5          Program that referred you to the -- actually

6          referred you to the psychiatrist.

7    A.    Right.  Right.

8    Q.    Not Mr. Murphy or not the Department of

9          Agriculture.

10   A.    Right.

11   Q.    And that Employee Assistance Program is part

12         of your State benefits, correct?  I mean, it's

13         a benefit you get if you need it.

14   A.    Right.

15   Q.    Okay.  And was it your understanding that you

16         were being referred to the Employment

17         Assistance Program for an anger management

18         issue?

19   A.    No.

20   Q.    Okay.  What were you told?  What were you told

21         about it, about the referral?

22   A.    He may have told me that, you know, that --

23         Well, I don't -- I don't remember.

Deposition of John L. Crayton                    April 17, 2008

Page 176

1    Q.    Just so I'm clear, did you actually meet with

2          someone with the Employee Assistance Program?

3    A.    No.

4    Q.    Okay.  You just contacted them?

5    A.    Right.

6    Q.    And -- Over the telephone?

7    A.    Yes.

8    Q.    And told them who you were?

9    A.    Yes.

10   Q.    And then they made the referral back to

11         Dr. Smith.

12   A.    No.  They gave me Dr. Smith -- they gave me --

13         Well, Dr. Smith was the second person that

14         they gave me.  There may have been a conflict

15         with the first individual they gave me.

16   Q.    So -- But you made the appointment.

17   A.    I made the appointment, yes.

18   Q.    All right.  Based on the information that the

19         Employment Assistance Program gave you.  I

20         mean, they gave --

21   A.    Yeah, they gave me his name and -- Yes.

22   Q.    That's all I'm trying to say.  All right.  Let

23         me see here.

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

JOHN L. CRAYTON            )

       Plaintiff,            )

v.            )    Case No.:    2:07-cv-626-MEF

ALABAMA DEPARTMENT OF   )         (LEAD CASE)
AGRICULTURE & INDUSTRIES,   )

       Defendant.          )

**********************************

JOHN L. CRAYTON            )

       Plaintiff,            )

v.            )    Case No.:    2:07-cv-1111-MEF

ALABAMA DEPARTMENT OF   )        (MEMBER CASE)
AGRICULTURE & INDUSTRIES,   )

       Defendant.          )

## AFFIDAVIT OF LANCE HESTER

Before me, the undersigned authority, on this day personally appeared Lance Hester, who being by me first duly sworn, deposed and stated upon his oath the following:

My name is Lance Hester. I am over the age of twenty-one (21) years and I have personal knowledge of the following:

I am a Division Director with the Alabama Department of Agriculture. I have been employed with the Alabama Department of Agriculture for 29 years. In my capacity as Division Director, I was John Crayton's supervisor for some time.

In the fall of 2004, the Department of Agriculture received several complaints about the work product generated by the Seed Lab under the supervision of Program Director John Crayton. True and correct copies of these complaints are attached hereto. These complaints were cause for great concern because farmers and agricultural business were adversely affected. Further, the Department of Agriculture is a state agency and values its reputation in the agriculture community both in and out of the State of Alabama. It is therefore, imperative that the Seed Lab perform its duties in professional and timely manner so as to retain its position as a leader in the agriculture industry.

Mr. Crayton received a reprimand as a result of the complaints by clients of poor work performance in the Seed Lab. The purpose of the reprimand was to facilitate correction of problems. Mr. Crayton's pay was not reduced nor did he lose any benefits as a result of the reprimand.

The Department of Agriculture, aware of the emerging and growing field of genetically modified plants, starting looking into the development of a Genetically Modified Plant Program in 2005. This program actually got underway in 2006. Mr. Crayton was tapped to serve as Program Director of this new program. Mr. Crayton's educational background and experience in the Seed Lab made him suitable for this position.

Upon Mr. Crayton's reassignment to the position of Program Director of the Genetically Modified Plant Program, his previous duties as Program Director of the Seed Lab were assigned to Andrae McMillan, a black male, who is a certified seed analyst.

_____
LANCE HESTER

2

STATE OF ALABAMA

COUNTY OF MONTGOMERY

Before me, the undersigned Notary Public, did personally appear Lance Hester who states to me that he is aware of the contents of the foregoing Affidavit, and that he did execute it voluntarily.

SWORN TO and SUBSCRIBED before me on this the **30th** day of **May** 2008.

_____
NOTARY PUBLIC

# STATE OF ALABAMA

## DEPARTMENT OF AGRICULTURE AND INDUSTRIES
### 1445 Federal Drive
### Montgomery, Alabama 36107-1123



*Ron Sparks*
Commissioner

**MEMO**

Mailing Address:
Post Office Box 3336
Montgomery, AL 36109-0336

Date:       September 21, 2004

To:         Doug Rigney

From:       Glen Zorn

Subject:    Seed Lab

Mr. Carl Sanders from Coffee County called today and reported that he had submitted oat and wheat seed to the Department of Agriculture and Industries Seed Lab and requested for germination test to be performed.  After several weeks of not hearing from the Seed Lab he called in and was informed by Andrae McMillian that no germination test had been completed since August due to computer problems.  Mr. Sanders was very concerned about our Seed Labs inability to provide results of germination test in a timely manner.

FROM : BRAGG FARMS                    FAX NO. :256 828 3611                    ᴚ. 30 2004 01-14PM P2



**BRAGG** F A R M S

September 30, 2004

Mr. Doug Rigney
Assistant Commissioner of Agriculture
P.O. Box 3336
Montgomery, AL 36109

Dear Mr. Rigney,

I am writing to give you a summary of the difficulties I have experienced in dealing with the Alabama State Seed Lab this summer. After hearing in July, the good report on the shortened turn-around time on samples, I was surprised by the prolonged period I've had to wait for analyses during August and September.

We began cleaning wheat in July. The first samples were pulled on July 15th. Out of 83 samples pulled from July 15th through September 2nd, I have only received printed individual test results back on only 20 of these samples.

I have received a few typed summary sheets showing the results of 49 more samples provided to me by Mr. Benny Hitch in Compliance. The earliest summary sheet is dated August 23rd. It was explained to me at that time that 'the computer had been and still was down' in the seed lab, therefore there were no individual reports being printed and sent out. I understood at that time the computer went down earlier in August.

A summary sheet dated September 3rd showed the analysis of the very last sample to be pulled before all information flow ceased from the lab. My lot number was 601 with a corresponding lab number of 23341. That particular sample was pulled on August 12th. The remaining 14 samples (lots 602-615) were pulled August 19th, 26th and September 2nd. Yesterday the seed lab staff told me that the computers were still down and cards couldn't be printed. I replied that I didn't realize the computers were tied to the germination process. The response given was again that they couldn't print any cards. I asked for the status of my remaining 14 samples. In a phone call later the same day, I was told they were in the germinator with a first reading on Friday, Oct 1st.

1180 Grimwood Road ▪ Toney, AL 35773 ▪ Phone/Fax 256 828 3611

My 2 chief complaints/concerns are this. It appears the computer has been down for a full two months now. Unacceptable. I add value to my seed, by invoicing my customers with a copy of the state seed lab report. To date I only have 20 of those, less than one-quarter of those submitted, in my hand. Also, of those samples just now in the germinator, some were pulled 6 weeks ago. Far too long. The printing of reports should have no bearing on the samples going in/out of the germinator.

Mr. Rigney, immediate relief is needed in this situation. The computer needs to be fixed or replaced. New management needs to be hired.

Sincerely,

Jeannie Bragg Harvey

Per Yogi Sormrude
.From: Mock, Amanda (CAG-AP) [Amanda.Mock@UAP.com]
Sent: Monday, October 04, 2004 9:44 AM
To: Spear, Reida
Cc: Sormrude, Yogi (CAG-AP)
Subject: Per Yogi Sormrude

Glen:

Over the last 4 - 5 years, we have seen a continuous decline in services provided
by the seed lab. It has gotten to the point where we send all of our samples to a
private lab, due to the unreliability you have to perform a service. Over the last
two years the "seed lab" has provided "minimal"
services. Last year their excuse was they had so many samples to test they were not
taking any more. This year is that they are having equipment
difficulties. Either excuse doesn't help us very much. I do not see the
state lowering our licensing fees due to this inept department. Remember, most
people do not believe state employees do anything anyway, and the Seed Lab is a
prime example.

Sincerely,
Yogi Sormrude





# STATE OF ALABAMA

## DEPARTMENT OF AGRICULTURE AND INDUSTRIES

1445 Federal Drive
Montgomery, Alabama 36107-1123

*Ron Sparks*
Commissioner

October 4, 2004

Mailing Address:
Post Office Box 3336
Montgomery, AL 36109-0336

MEMORANDUM

TO:        JOHN CRAYTON, PROGRAM DIRECTOR
           SEED LABORATORY

FROM:      LANCE HESTER, DIVISION DIRECTOR
           AGRICULTURE AND ANIMAL PROTECTION

SUBJECT:   REPRIMAND FOR FAILURE TO PERFORM JOB PROPERLY

In accordance with rules of the State Personnel Board, the purpose of this memorandum is to provide you with a written reprimand for failure to perform your responsibilities properly. Included in this memorandum are references and a history of the recent events that have made this reprimand necessary. This reprimand will be included and attached to your six months review as well as your annual appraisal.

On Tuesday September 21, 2004 Ronnie Murphy (Deputy Commissioner) was notified by the Commissioner's office about two complaints from seed processors or farmers that had samples in the seed laboratory for an extended period of time and had not received their analysis report. These samples were 'In Test' samples indicating the company needed the test results before they were to be sold or planted. One seed processor reported to the Commissioner's office that when he inquired about the tests that John Crayton indicated that the delay was due to the computer being down. Since that time we have had four additional complaints from industry indicating the negative economic impact that this delay has caused.

Ronnie Murphy contacted John Crayton after becoming aware of the first two complaints. Mr. Murphy informed me on Tuesday September 21, 2004 that John Crayton's explanation was that blank laboratory cards were on the server and could not be printed. Mr. Crayton indicated that they could not process samples because they had not been able to generate the cards from the computer since August 23, 2004. It should be noted that the computer server was down from August 23, 2004 until the week of September 20, 2004.

Through Mr. Murphy's communications with Mr. Crayton on September 21, 2004 it was determined that approximately fifty five (55) 'In Test' samples were in the laboratory

waiting processing and analysis. '*In* Test' samples are those sent in by industry or farmers to determine results required prior to sale or needed to make farm management decisions regarding what seed to plant. On the afternoon of Tuesday September 21, 2004 I visited with Mr. Crayton to emphasize again the need to get these processed as soon as possible. I also stated to Mr. Crayton that he was authorized to utilize compensatory time for overtime if this could speed up the process.

The events described in this memorandum should not have occurred. The unavailability of the data base from the server has caused inconveniencies. The critical choices you were faced with were as follows: (1) Changes could be made in the processing of samples to accommodate industry, farmer and Department needs; or (2) Services could be discontinued which would adversely affect the marketing abilities of the seed industries. The answer should have been obvious. We should have made changes in processing to accommodate the industry and farmer needs. However, the decision that was made disrupted commerce of seed and caused an embarrassment to the Department, the Commissioner and the employees. At no time did you choose to discuss this situation with your Division Director or the Deputy Commissioner. Simply generating the computer cards manually or through other available computer programs (such as Microsoft word) could have averted the whole situation.

The purpose of this reprimand is to facilitate correction. It is intended that this reprimand provide emphasis to the need to carefully consider the decisions that have a direct affect on those that we regulate and serve. I sincerely hope that we do not have to address similar situations in the future. However, any similar occurrences in the future will be addressed through the proper actions as set forth by the State Personnel Department. Additional violations of work rules could result in suspension or dismissal.

Certain steps need to be taken to assure that similar problems do not recur. Weekly meetings will be set to discuss with you the processing of samples through the seed laboratory. It will be necessary for you to provide a written weekly summary of the samples on hand in the laboratory. Any problems, priorities, goals or other relative topics should also be discussed at these meetings. These weekly sessions will be attended by Commissioner Ron Sparks and /or Deputy Commissioner Doug Rigney and/or Division Director Lance Hester.

As Program Director of the Seed Laboratory you have great responsibilities. It is my hope that you are very successful in achieving the desired results in the administration of you duties. If there is anything I can do to provide guidance or assistance please let me know.

**MEMORANDUM**

TO:        Alabama Seed Dealers

FROM:      Commissioner Ron Sparks

RE:        Day to Day Operations of the Seed Lab

DATE:      October 4, 2004

---

Recent circumstances, events, and occurrences in the Department of Agriculture and Industries Seed Laboratory have caused great concern to this administration. I want to personally assure you that the uninterrupted stream of commerce within Alabama's seed industry is my paramount concern, and my executive staff and I have taken significant steps to attain this goal.

Assistant Commissioner Doug Rigney, Division Director Lance Hester and I are currently exercising and will continue to exercise more immediate supervision over the operation of the seed laboratory. We will monitor daily and weekly operation of the seed laboratory and move immediately to correct any shortcomings or failures recognized. To this end, any communication with the seed laboratory from this date forward should be directed explicitly to me, Doug Rigney, or Lance Hester so that the appropriate action may be taken.

Again, the goal of this department and more specifically this administration is to serve the most efficient and productive seed industry in this nation. We appreciate your time and cooperation in this matter.





# STATE OF ALABAMA

## DEPARTMENT OF AGRICULTURE AND INDUSTRIES
1445 Federal Drive
Montgomery, Alabama 36107-1123

*Ron Sparks*
Commissioner

Mailing Address:
Post Office Box 3336
Montgomery, AL 36109-0336

## Memorandum

**DATE:**      May 11, 2005

**TO:**        John Crayton, Program Director
              Seed Lab

**FROM:**      Lance Hester, Division Director
              Agi & Animal Protection

**Cc:**        Doug Rigney, Assistant Commissioner

**SUBJECT:**   Warning / Failure to Follow Rules & Directives

The purpose of this memorandum is to provide written documentations of the information discussed with you on this date. Recently there have been several occasions that you have chosen to violate state or departmental rules relative to purchase request. Also your actions have been contrary to the directions provided to you in written memorandums concerning leave request and delivery of samples into the laboratories. The following is a list of specific actions and events that has resulted in the need for this memorandum. Where applicable written documentation has been provided.

1. Attached is a memorandum dated March 24, 2005 regarding annual leave, sick leave and itineraries. On Thursday May 5, 2005 you left your workplace for a dental appointment, the time of your departure was approximately 2:00 P.M. I was informed of this dental appointment as you were on your way out. This was the first time I was made aware that you intended to be away from the workplace on leave. I never received a written leave request in advance for review and approval as set forth in the March 24, 2005 memorandum. It should also be noted that your departure took place as members of the Alabama Seedsman Association Board of Directors arrived for a pre-arranged tour of The State Seed Laboratory. You had been made aware of this tour on Tuesday, May 3, 2005. It is very disappointing that you apparently do not value the interest of the industry for which the laboratory exists to serve and regulate.

2. On May 4th or 5th I received your revised itinerary for the week of May 2-6, 2005. You had changed the Friday 6, 2005 status from annual leave to office. Also you submitted an itinerary for the week of May 9-13, 2005. The itinerary indicated that you would be on annual leave Monday May 9, 2005. You also left a message on my voice mail that you **would** be on leave the following Monday, May 9, 2005. Please refer back to the March 24, 2005 memorandum. You have not provided a **request** for annual leave or sick leave in advance when you have obviously known in advance of your intentions.

3. I called Mr. John Crayton Tuesday, May 10, 2005 at approximately 8:45 A.M. to request a meeting with Mr. Rigney and myself this afternoon. I was informed he had a 2:00 p.m. dental appointment, this was the first and only notice I received.

4. On May 3, 2005 you were provided a memorandum (see attachment) that confirmed the April 18, 2005 memorandum (see attachment) concerning delivery of the seed samples into the laboratory. During the Tuesday, May 03, 2005 meeting Assistant Commissioner Doug Rigney gave you a direct order to follow the procedures as set forth in the April 18, 2005 memorandum. According to Mr. Rigney's instruction implementations was to take place immediately. When Jimmy Hagood arrived with the samples on Wednesday, May 04, 2005 the laboratory was not prepared and did not assist in receiving the samples into the laboratory as required by the April 18, 2005 memorandum and Mr. Rigney's direct order. I did receive your memorandum dated May 5, 2005 addressing your response in complying with the directions set forth in the memorandum. Your memorandum did not assign a primary contact person or a secondary contact person as required by the instructions.

5. On April 4, 2005 you submitted an 'after-the-fact' purchase request in the amount of $1243.00 for toner cartridges you ordered by phone. At this time you already had the cartridges in your possession. You failed to follow state and departmental rules required for proper purchasing procedure (see documentations attached).

6. On April 4, 2005 you submitted several requests that went to purchasing. Included in the printing request were four separate reports that you later indicated would be used for back-up in case the computers went down. These orders requested 25,000 of each, which totaled **$9045.53**. As you are aware I have reviewed and revised your request. Based on history we might experience problems generating reports from the computers perhaps as much as six weeks out of a year. That means we could need as many as 450 reports for 'back-up' per year. Your order(s) for 75,000 reports would be enough to last 166 years. The order(s) have been revised downward to 500 for the mixture report, 500 for the unofficial report, and 1000 for the 2 page official report, giving us a total cost of **$392.92**. This would be enough for at least a four month supply, should we have a catastrophic computer system failure. While problems beyond a four month period would be unexpected we still could order additional forms as necessary.

Any failure to follow direct orders, written memorandums, State rules, or Departmental rules is considered very serious. When there are several such occurrences it could represent a total disregard for such requirements. The items listed in this memorandum are provided for your consideration. The objective of this warning is not punishment but to bring a change in behavior resulting in compliance with rules and adherence to directives. It is my sincere hope that no additional disciplinary action will be necessary.


*John L. Crayton*

John Crayton
Signature of Employee (Indicates receipt of warning)
Page 2

# STATE OF ALABAMA

## DEPARTMENT OF AGRICULTURE AND INDUSTRIES
1445 Federal Drive
Montgomery, Alabama 36107-1123

*Ron Sparks*
Commissioner

July 28, 2006

Mailing Address:
Post Office Box 3336
Montgomery, AL 36109-0336

Mr. John Crayton, Program Director
Department of Agriculture and Industries

Dear Mr. Crayton:

The Department of Agriculture and Industries is responsible for many programs which directly and indirectly impact the agricultural businesses and the consumers of these products. It is a role that we take very seriously. As we endeavor to meet the progressive changes and mandates that affect this state, it is necessary to delve into areas of research, development, and the establishment of regulatory requirements.

As you are aware, genetically modified plants are being developed and integrated into the mainstream of agricultural production. It is imperative that we ensure that the citizens of this state are informed, protected, and the producers of these plants regulated. In an attempt to develop this program within the department, we realize that it is necessary to have a knowledgeable individual in this area to head up and establish just such a program. With your background and experience in the seed industry, it has been determined that you are the best qualified to handle these duties and responsibilities.

Therefore, this is notification that your duties and responsibilities are being reassigned effective immediately. As Program Director, you will now be responsible for the Genetically Modified Plant Program. As an essential function of your new duties, you are to report to and communicate with your immediate supervisor, Mr. Ronnie Murphy, Deputy Commissioner, of the functions, responsibilities, and structure of this new program.

We look forward to the positive impact that you will have upon these labs, in this area.

Sincerely,

Ray Hilburn
Deputy Commissioner

Sincerely,

Ronnie Murphy
Deputy Commissioner

C:    Personnel

*"We provide employment & services without discrimination."*

# CHARGE OF DISCRIMINATION

This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form.

| Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|
| ☐ FEPA | |
| ☒ EEOC | 420-2006-05216 |

and EEOC

State or local Agency, if any

| Name (indicate Mr., Ms., Mrs.) | Home Phone (Incl. Area Code) | Date of Birth |
|---|---|---|
| **Mr. John L. Crayton** | **(334) 272-3487** | **05-03-1945** |

| Street Address | City, State and ZIP Code |
|---|---|
| **124 Elm Drive, Montgomery, AL 36117** | |

Named is the Employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency That I Believe Discriminated Against Me or Others. (If more than two, list under PARTICULARS below.)

| Name | No. Employees, Members | Phone No. (Include Area Code) |
|---|---|---|
| **AL DEPT OF AGRICULTURE & INDUSTRIES** | **201 - 500** | **(334) 240-7100** |

| Street Address | City, State and ZIP Code |
|---|---|
| **1445 Federak Drive,  Montgomery, AL 36107** | |

| Name | No. Employees, Members | Phone No. (Include Area Code) |
|---|---|---|
| | | |

| Street Address | City, State and ZIP Code |
|---|---|
| | |

RECEIVED
EEOC

SEP 2 7 2006

BIRMINGHAM DISTRICT OFFICE

| DISCRIMINATION BASED ON (Check appropriate box(es).) | DATE(S) DISCRIMINATION TOOK PLACE |
|---|---|
| | Earliest / Latest |

☒ RACE  ☐ COLOR  ☐ SEX  ☐ RELIGION  ☐ NATIONAL ORIGIN
☒ RETALIATION  ☐ AGE  ☐ DISABILITY  ☐ OTHER (Specify below.)

Earliest **07-28-2006**   Latest **09-26-2006**

☐ CONTINUING ACTION

THE PARTICULARS ARE (If additional paper is needed, attach extra sheet(s)):

I began my employment with the employer named above as a seed analyst on May 19, 1976. Upon Mr. Lance Hester becoming my supervisor, I began to be subjected to adverse terms and conditions of employment in my position of seed program director. Mr. Hester constantly challenged decisions that I made regarding a particular product although he had no expertise in the area to which I was assigned. The position of seed director was considered to be very influential and one would come in contact with people who had power. During June of 2006, I complained to the Alabama State Employees Association that I, as well as other Blacks were being subjected to unlawful employment discrimination because of our race. On July 28, 1006, I was reassigned from my position of seed program director to a recently created position of genetically modified plant and plant products director. I was the first Black to hold the position of seed program director and the position was awarded to a lesser qualified White following my reassignment.

I believe that I was discriminated against in violation of Title VII of the 1964 Civil Rights Act, as amended because of my race, Black and in retaliation to my complaint of unlawful employment discrimination.

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – When necessary for State and Local Agency Requirements |
|---|---|
| I declare under penalty of perjury that the above is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief. SIGNATURE OF COMPLAINANT |

**Sep 27, 2006**
Date

*John L. Crayton*
Charging Party Signature

SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE
(month, day, year)

Attachment 1

# EMPLOYEE ASSISTANCE PROGRAM

## SUPERVISOR'S REFERRAL FORM

Employee: _John Crayton_          Home Phone: _____

Position: _Program Director_      Office Phone: _240-3710_

Referring Supr: _Ronnie Murphy_   Office Phone: _____

County or State Office/Division: _Agriculture Div._

Observation:  (Check the reasons for warranting the referral)

A.  Absenteeism and Punctuality

|    |     |                                              |     |
|----|-----|----------------------------------------------|-----|
| 1. | Misses work 1 day every 2 weeks              | _____ |
| 2. | Misses work 1 day every week                 | _____ |
| 3. | Misses work 2 or more days/week              | _____ |
| 4. | Unusual excuses for absences                 | _____ |
| 5. | Leaves the work place without authorization  | _____ |
| 6. | Difficult to locate at work                  | _____ |
| 7. | Extended breaks                              | _____ |
| 8. | Extended lunch periods                       | _____ |
| 9. | Early departures from work                   | _____ |
| 10.| Late arrivals at work                        | _____ |

B.  Job Performance

|    |     |                                              |     |
|----|-----|----------------------------------------------|-----|
| 1. | Volume of work has declined                  | _____ |
| 2. | Errors of work have increased                | _____ |
| 3. | Working patterns are erratic                 | _____ |
| 4. | Failure to meet schedules                    | _____ |
| 5. | Is forgetful of assignments                  | _____ |
| 6. | Poor concentration in performing tasks       | _____ |

C.  Communication and Relationships

|    |     |                                              |     |
|----|-----|----------------------------------------------|-----|
| 1. | Avoids conversations and discussions         | ✓ |
| 2. | Unable to express thoughts clearly           | _____ |
| 3. | Is not patient with others                   | ✓ |
| 4. | Is quick tempered                            | ✓ |
| 5. | Unable to get along with others              | ✓ |

    6.       Usually critical of others                         _____

    7.       Spends too much time in conversations with others   _____

**D.**    **Supervision Responsiveness**

    1.       Avoids supervisor      _____

    2.       Unusually sensitive to advice      _____

    3.       Does not follow recommendations      _____

    4.       Unusually critical of supervisor      ✔

    5.       Unusually argumentative with supervisor      _____

**E.**    **Job Interest and Judgement**

    1.       Loss of interest in job      _____

    2.       Disregard for policies, rules, procedures      _____

    3.       Not concerned with safety of self and others      _____

**F.**    **Narrative Description (if needed)**

    \*       Based on consultation between our personnel
                staff and state personnel, I am making a
                supervisor's referral to the Employee
                Assistance Program.

    \*\*      This referral is being made because of your ___
                interaction with fellow employees and
                demonstrated anger toward management.

    \*       This  is a mandatory referral.

    \*       You should contact the BHS Care Coordinator
                at 1-800-245-1150 by Decenber 6, 2006
                to schedule an appointment.

Acknowledgment:  It is understood that the information above is confidential and has been compiled to assist the employee.

Supervisor's Signature: *Bernice D Murphy*      Date: 11/14/06

Employee's Signature: _____      Date: _____

As the employee, my signature authorizes the release of this referral and the information herein to

_____
              (Assessment Individual)

*Employee refused to sign until he obtains legal
Counsel & write a rebutal.   Bernice DMurphy*

# VBHS BEHAVIORAL HEALTH SYSTEM
## CLINICAL ASSESSMENT REPORT AND TREATMENT PLAN

Check One:  ☒ Initial Assessment   ☐ Continuing Care (Only Sections E-J)   Today's Date: **Dec 5th 2006**

Patient Name: **John Crayton**   Date of Birth: **5 - 3 - 45**   Age: **61**   ☒ Male  ☐ Female

Insured Employer: **Dept of Agriculture**   Provider Name, Licensure: **Clinton Smith, By D LPC**

---

## A. Presenting Problems (Check all that apply):

☐ Anger
☐ Impaired judgment
☐ Elevated mood
☐ Guilt
☐ Helplessness
☐ Hyperactivity
☐ Impulsiveness
☐ Obsessions
☐ Panic attacks
☐ Somatic complaints
☐ Appetite disturbance
  ☐ Weight loss
  ☐ Weight gain
☐ Withdrawn
☐ Sleep disturbance
  ☐ Increased sleep
  ☐ Decreased sleep
☐ Delusional
☐ Anxiety
☐ Compulsions
☐ Poor concentration

☐ Decreased energy
☐ Depressed mood
☐ Dissociative state
☐ Fears
☐ Grief
☐ Hallucinations
  ☐ Auditory
  ☐ Visual
☐ Irritability
☐ Memory loss
☐ Oppositional
☐ Paranoia
☐ Worthlessness
☐ Binging
☐ Purging
☐ Marital conflict
☐ Family conflict
☐ Physical fighting
☐ Learning disability
☐ Grandiosity
☐ Distractibility

Symptoms have been present for:
☐ < 1 Mo   ☐ 1-6 Mos   ☐ 7-12 Mos   ☐ > 1 Yr
☐ Physical/Sexual Trauma Victim   At What Age: _____
☐ Physical/Sexual Trauma Perpetrator

Legal problems: _____

Substance Abuse (including substance, amount, and frequency):
**Denied the use of alcohol or drugs**

## B. Previous Treatment History:

**Psychiatric**
☒ None
☐ Outpatient
☐ Inpatient
  ☐ w/in past 12 mos
  ☐ 2 or more admissions

**Substance Abuse**
☒ None
☐ Outpatient
☐ Inpatient
  ☐ w/in past 12 mos
  ☐ 2 or more admissions

**Medication History:**
Has patient been treated with psychotropic medication?   ☐ Yes  ☒ No

Is the patient compliant with medication regimen?   ☐ Yes  ☐ No

Prescribing provider:  ☐ Psychiatrist  ☐ PCP  ☐ Pediatrician  ☐ Other

## C. List psychotropic medications, dosage and frequency:

**NA**

## D. Other pertinent medical information:

**NA**

---

## E. Risk Assessment (Check all that apply):
Suicidality:  ☒ Not present  ☐ Ideation  ☐ Plan  ☐ Means  ☐ Prior attempt
  Describe: _____
Homicidality:  ☐ Not present  ☐ Ideation  ☐ Plan  ☐ Means  ☐ Prior attempt
  Describe: _____
Other dangerous or self-injurious behaviors: _____

---

## F. Current Level of Functioning (Please rate level of impairment in each area):

| | None | Minimal | Mild | Moderate | Severe | Profound | Comments |
|---|---|---|---|---|---|---|---|
| Marriage/family | 0 | 1 | 2 | 3 | 4 | 5 | |
| Work/school performance | 0 | 1 | 2 | 3 | 4 | 5 | |
| Social | 0 | 1 | 2 | 3 | 4 | 5 | |
| Activities of daily living | 0 | 1 | 2 | 3 | 4 | 5 | |

Other Factors / Pertinent Information Impacting Treatment (e.g., family/social history, test results, lab values, comorbid issues):
_____
_____

**G. DSM IV Diagnoses:** 17169

| | | |
|---|---|---|
| Axis I: | No Diagnosis | |
| Axis II: | | |
| Axis III: | | |
| Axis IV: | | |
| Axis V: | Current___ Highest in past year___ Anticipated at discharge___ | |

| | |
|---|---|
| 91-100 | Superior function |
| 81-90 | Minimal symptoms |
| 71-80 | Mild/transient symptoms |
| 61-70 | Mild symptoms |
| 51-60 | Moderate symptoms |
| 41-50 | Serious symptoms |
| 31-40 | Impaired reality testing |
| 21-30 | Inability to function in many areas |
| 11-20 | Some danger |
| 0-10 | Serious danger of hurting self or others/ Inability to maintain minimal self care |

**H. Treatment Approach:**

☐ Crisis stabilization  ☐ Symptom reduction  ☐ Cognitive-behavioral  ☐ Behavior modification

☐ Solution focused  ☐ Insight oriented  ☐ Supportive  ☐ Other

**I. Treatment Plan** (Must be behaviorally measurable and have an expected time frame for achievement):

Goal #1 I do not recommend follow up treatment.

Objectives: There appears to be an interpersonal problem with
1  Mr Crayton and his supervisor, Ronnie Murphy and complains
2  Mr Sparks. Mr Crayton alleges promotion discrimination
3  and makes a claim with EEOC and ASEA.

Goal #2 Mr Crayton refused to sign the Supervisory

Objectives: referral authorization form.
1
2
3

Goal #3 _____

Objectives:
1
2
3

Alternate plan should the patient fail to progress as expected:

_____

**J. Treatment Services Requested:**

☐ Individual Therapy w/ master's or PhD
☐ Individual Therapy with physician
☐ Family Therapy
☐ Marital / Couples Therapy
☐ Group Therapy
☐ Other

**# Sessions / Frequency**

**Other Services Recommended:**

☒ None                           ☐ Medication evaluation
☐ Family                         ☐ Psychological testing
☐ Marital / Couples             ☐ CD assessment
☐ Group

☐ AA / NA                        ☐ Other support group ___
☐ Intensive outpatient program  ☐ Partial hospitalization
☐ Inpatient treatment
☐ Other _____

Estimated total number of sessions to complete episode of treatment:
☐ <4  ☐ 4-8  ☐ 9-12  ☐ Other

\* Please note, BHS may authorize a maximum of 6 visits based on this treatment request.
A new treatment request should be submitted if continued treatment is necessary.

Provider Name: _____

Date: 12-5-6

Patient Name: _____

# CHARGE OF DISCRIMINATION

This form is affected by the Privacy Act of 1974. See enclosed Privacy Act
Statement and other information before completing this form.

| Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|
| ☐ FEPA | |
| ☒ EEOC | 420-2007-02801 |
| | and EEOC |

State or local Agency, if any

| Name (indicate Mr., Ms., Mrs.) | Home Phone (Incl. Area Code) | Date of Birth |
|---|---|---|
| Mr. John L. Crayton | (334) 272-3487 | 05-03-1945 |

| Street Address | City, State and ZIP Code |
|---|---|
| 124 Elm Drive, Montgomery, AL 36117 | |

Named is the Employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency That I Believe Discriminated Against Me or Others. (If more than two, list under PARTICULARS below.)

| Name | No. Employees, Members | Phone No. (Include Area Code) |
|---|---|---|
| ALABAMA DEPT. AGRICULTURE & INDUSTRIES | 201 - 500 | (334) 240-7100 |

| Street Address | City, State and ZIP Code |
|---|---|
| 1445 Federal Drive, Montgomery, AL 36107 | |

| Name | No. Employees, Members | Phone No. (Include Area Code) |
|---|---|---|
| | | |

| Street Address | City, State and ZIP Code |
|---|---|
| | |

DISCRIMINATION BASED ON (Check appropriate box(es).)

☒ RACE  ☐ COLOR  ☐ SEX  ☐ RELIGION  ☐ NATIONAL ORIGIN
☒ RETALIATION  ☐ AGE  ☐ DISABILITY  ☐ OTHER (Specify below.)

| DATE(S) DISCRIMINATION TOOK PLACE | |
|---|---|
| Earliest | Latest |
| 12-05-2006 | 05-02-2007 |

☐ CONTINUING ACTION

THE PARTICULARS ARE (If additional paper is needed, attach extra sheet(s)):

I am Black and I was hired by the above named employer on May 19, 1976, as a seed analysis and I was eventually promoted to seed program director. On July 28, 2006, I was demoted to the position of genetically modified plant and plants products director, which I protested. On September 27, 2006, I filed charge 420-2006-05216 because of my demotion and reassignment to another job. On November 30, 2006, my supervisor had me to enroll in an employee assistance program, which I protested. I had a schedule job performance review that should have been completed no later than April 30, 2007. Any pay raise that I would have received is based on my job performance review being completed in a timely manner, which has not occurred. On May 2, 2007, I learned from personnel that my supervisor should have completed and submitted my annual job performance review as required by April 30, 2007, so that I would be eligible for a merit pay raise.

I believe that I am being discriminated against because of my race, Black and in retaliation for having filed a previous charge in violation of Title VII of the Civil Rights Act of 1964, as amended.

RECEIVED
EEOC

MAY 3 2007

BIRMINGHAM DISTRICT OFFICE

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – When necessary for State and Local Agency Requirements |
|---|---|
| I declare under penalty of perjury that the above is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief. SIGNATURE OF COMPLAINANT |
| May 03, 2007 _John L. Crayton_ <br> Date        Charging Party Signature | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE (month, day, year) |