IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA,
NORTHERN DIVISION

JOHN CRAYTON,

    Plaintiff,            )

v.                            )    Civil Action No: 2:07-CV-626

STATE OF ALABAMA       )    (LEAD CASE)
DEPARTMENT OF AGRICULTURE &
INDUSTRIES,              )

    Defendant.         )

## PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

**COMES NOW** the Plaintiff, John Crayton, and responds to the Defendant's Motion for Summary Judgment and moves this Honorable Court to deny Defendant's Motion for Summary Judgment. As grounds therefore, the Plaintiff avers that there is a genuine issue of material fact to be submitted to a jury of Plaintiff's peers, and the Defendant is not due summary judgment as a matter of law, as to any claims made by the Plaintiff. In support of his response, Plaintiff relies on the applicable law, pleadings, depositions and affidavits attached hereto and for his response hereby provides as follows:

### I. SUMMARY OF THE CASE

**Nature of the Case**

This action was filed by John Crayton against the Alabama State Department of Agriculture & Industries in violation of Title VII of the Civil Rights Act of 1964, as amended, and retaliation.

**Course of Proceedings**

This lawsuit was timely filed in the United States District Court for the Middle District of Alabama, Northern Division on July 9, 2007. (Exhibit "1" - Complaint). Plaintiff filed his Amended Complaint on December 21, 2007. (Exhibit "2" – Amended Complaint). On this same date Plaintiff filed its second action against Defendant. (Exhibit "3" – Second Complaint). Defendant filed its Motion to Dismiss on March 12, 2008. (Exhibit "4" – Motion to Dismiss). Defendant filed its Answer to Plaintiff's Amended Complaint on March 18, 2008. (Exhibit "5" – Answer to Amended Complaint). Plaintiff filed his Response to Defendant's Motion to Dismiss and Court's Order to Show Cause Why Cases should not be Consolidated on March 24, 2008. (Exhibit "6" – Plaintiff's Response Re: Consolidation). Defendant filed its Response to Show Cause Order Re: Consolidation on March 24, 2008. (Exhibit "7" – Defendant's response to Consolidation). The first and second lawsuits were consolidated on April 1, 2008. (Exhibit "8" – Order). Defendant filed its Motion for Summary Judgment on May 30, 2008. (Exhibit "20" – defendant's Motion for Summary Judgment).

## II. PLAINTIFF'S SUMMARY OF FACTS

The Defendant sets forth what it labels as undisputed facts. The Plaintiff avers that the facts are very much disputed. Plaintiff is a black male over the age of 19. Plaintiff first began working for Defendant on or about May 19, 1976. (Exhibit "9" -Crayton Depo. p. 9, line 21, Complaint par. 7). Plaintiff has worked for the Defendant for over 30 years. (Crayton Depo. p. 9, line 12).

As the State Seed Program Director Plaintiff's job was to enforce the Truth in Labeling Law as it relates to the seed industry. Plaintiff's regulatory and administrative duties were gradually being taken away and given to Agriculture Compliance in violation of state codes. (Amended Complaint pars. 9 and 10).

On or about April 2002, Ronnie Murphy met briefly with Plaintiff and the laboratory staff to inquire about the backlog of samples and why it was taking so long getting the test results to the clients. Mr. Murphy was informed that these problems were occurring, because of severe staff shortage due to attrition, and every request to hire needed staff being denied. (Amended Complaint par. 11).

On or about May 2002, the three Seed Analysts and Plaintiff volunteered to work two to three hours after regular work hours to catch up the backlog of samples, which took five months to accomplish. Plaintiff was not recognized for the tremendous and unselfish sacrifice. (Exhibit "10" – Plaintiff's Affidavit , par. 2, Amended Complaint par. 12).

On or about September 2002, Ronnie Murphy asked Donny Walker to query the Seed Program data base to further scrutinize Plaintiff's work looking for faults and criticism. Not only did the staff and Plaintiff keep up with the workload, the query revealed that they had established a record turn around time on the test results. (Amended Complaint par. 13, Exhibit "11" – 2002 Quires).

On or about April 30, 2003, Plaintiff applied for the position of Division Director, and was ranked number 4 out of eight. The two individuals ranked 2 and 3 did not have a master's degree, which Plaintiff did, or the years of experience that Plaintiff had. The position was awarded to Lester Hester. Mr.

Hester was less qualified than Plaintiff.  Plaintiff was discriminated against when he was denied this promotion based on his race. (Amended Complaint par. 14). Due to Defendant's credentials and work experience Lance Hester could not have out ranked Defendant without manipulation by Commissioner Sparks and his administration.     Less experienced individuals often out ranked more experienced minorities on the resister.  For example, Mr. Cofer, white male, was promoted to Division Director from the same register.  (Plaintiff's Affidavit, par. 3).

Plaintiff's problems with Ron Sparks really escalated after Plaintiff, Wilma Fitzpatrick and Annie Patterson were summoned to Ron Sparks' office due to hearsay.  Ron Sparks initiated a volunteer monthly employee gathering.  These meetings took place in 2004. (Exhibit "23" – April 2, 2004 Memo to Employees on Get Together),  Plaintiff informed Mr. Sparks that the hearsay was true.  Plaintiff stated that his main reason for not participating in the events was due to the racially charged atmosphere that Mr. Sparks and his administration had created. Plaintiff also informed Mr. Sparks that he did not wish to use his lunch time, breaks and personal money for these gatherings.  After this meeting Mr. Sparks appeared to having a personal vendetta against Plaintiff.

On or about October 4, 2004, Plaintiff was summoned to the commissioner's office at about 3:45 p.m. Upon arrival, the secretary requested that Plaintiff have a seat because, Mr. Sparks wasn't ready to see him. After a fifteen to twenty minute wait, Plaintiff was finally ushered into the commissioner's office. Unaware of the purpose or reason for being summoned, Plaintiff was a bit startled as he entered the office and saw several people sitting around a

conference table. In attendance were Ron Sparks, Doug Rigney, Ronnie Murphy, Lance Hester, David Hooks, B.J. Russell and Dana Wallace. Mr. Sparks asked Plaintiff to take a seat and the commissioner informed Plaintiff that he was summoned to his office for the purpose of issuing him a letter of reprimand for failing to perform his job properly. (Exhibit "12" – Letter of Reprimand, Complaint par. 15). A query of Plaintiff's database (Exhibit "13" – 2003 -2004 Query of Database) along with the 760 plus substitute test reports prove that the reprimand to be groundless and pure harassment. (Exhibit "14" – Substitute Test Reports). The Plaintiff created these forms after the Department computer system went down. Before the computer went down, Plaintiff was able to generate forms from the computer. (Exhibit "15" – Computer Generated Forms). Though the Plaintiff was without the use of the computer generated test forms due to the computer system being out for months, Plaintiff took it upon himself to manually generate forms to ensure that the tests were sent out as timely as possible.

Plaintiff was asked if he had anything to say in his defense with regard to the reprimand. As one can imagine, after having been blind sided in such an underhanded way, Plaintiff was at a lost for words. Plaintiff informed them that the work was being done in as orderly and timely manner as possible under the circumstances. Plaintiff was simply being harassed by Mr. Sparks. (Amended Complaint par. 16). Notwithstanding the conditions that Plaintiff had to work within, no computer generated tests, Plaintiff still got the reposts out in an acceptable manner. In particular, Bragg Farms' complaint was unfounded

because all of the test results for Bragg Farm for the month of August 2004 had a better than average turn around time of eighteen days as opposed to the regular twenty days. (Exhibit "16" – Results from Bragg Farms before computer problem and results after computer problem). This fact alone shows that these letters were solicited by the administration. (Plaintiff's Affidavit, par. 6).

Plaintiff was reprimanded for problems that were out of his control. Plaintiff explained that the complaints it had received were due to the computer being down. The computers were out of service during the months of August and September 2004. This problem affected everyone using the server, including Mr. Hester. (Exhibit "17" – Shannon Burrton's Affidavit, Plaintiff's Affidavit, par. 7). Plaintiff explained to Defendant that it had provided him with only one report that was dated on or before September 21, 2004, complaint from Glen Zorn. (Exhibit "18" Memo from Glen Zorn). The Plaintiff made it clear and Defendant was aware that the recent computer failure that the Defendant was experiencing affected every regulatory program in the State Department of Agriculture. Plaintiff further explained to Defendant that if he had been informed of the true expected downtime, an alternative procedure would have been established sooner for sample movement through the system. (Exhibit "19" – Rebuttal to Memo of Reprimand).

It is curious that Plaintiff was the only person disciplined due to complaints during the sever problems that the Defendant was experiencing. Memos from Mr. Johnson and Mrs. Patterson to Arnold Leak, the Department's information technology specialists, about not having access to their data base show that the

whole department was affected by the computer problem. (Affidavit of Plaintiff, par. 8, Exhibit "21" – Supporting Memos of Other Programs being affected by Sever Problems). The entire department was experiencing problems, yet Plaintiff was reprimanded for a problem that was out of his control.

On or about October 4, 2004, Mr. Sparks sent a letter to Alabama Seed Industry and to Plaintiff's counterparts both state and federal, informing them that he was taking over the day to day operations of Alabama's program and that any communication with the seed laboratory was to be directed explicitly to him, Doug Rigney, or Lance Hester. This was another step in usurping Plaintiff's responsibilities and authority. (Exhibit "22" – Memo from Commissioner Sparks). Commissioner Sparks not only sent the October 4, 2004, memorandum to the Alabama Seed Industry, it was also sent to other state Seed Control Officials. This was done in an effort to further embarrass and harass Plaintiff, because of the personal vendetta against Plaintiff due to his race. (Affidavit of Plaintiff, par. 10).

The reprimand affected Plaintiff's annual evaluation by reducing his overall score by seven points, thus limiting Plaintiff to a one step raise, where Plaintiff would have received a two step raise. (Exhibit "30" – April 1, 2004 Evaluation, Affidavit of Plaintiff, par. 9).

In or around April 2005, the Governor sent out a mandate that all unnecessary vehicles were to be taken from employees. The Defendant removed vehicles from its program directors and other management employees. The vehicles were eventually redistributed. However, Plaintiff and no other

blacks were given their cars back. After persistent requests, George Parrish, black, was eventually given his vehicle back. (Amended Complaint, par. 18). Some of the similarly situated whites were Benny Hitch, Lance Hester, Tomm Johnson, Tony Cofer and Joe Debro. (Amended Complaint, par. 18, Plaintiff's Affidavit, par. 11). Defendant states that Plaintiff did not travel a great deal in his position; therefore, he did not need a car; however, Tomm Johnson, Tony Cofer and Joe Debro, white/males, did not do substantial traveling, yet their cars were returned. These men predominately used the cars to travel from home to work. (Plaintiff's Affidavit, par. 11).

Plaintiff's not traveling out of town was due to a shortage of trained, experienced Seed Analysts to keep up with the work load and maintain the newly established record of a twenty one day turnaround time on all results in spite of the Administration's (Mr. Hester and Mr. Murphy) efforts to sabotage and disrupt Plaintiff's work by deleting and manipulating his computer files and tampering with Plaintiff's office files. (Plaintiff's Affidavit, par. 13). Plaintiff complained about this problem in an August 31, 2004 meeting. Due to the fact that the Defendant was behind this act of sabotage it attempted to cover this fact up by pretending that it would look into this matter. (Exhibit "23" – Letter from Lance Hester).

During June of 2006, Plaintiff complained to the Alabama State Employees Association (A.S.E.A.) that he, as well as other Blacks was being subjected to unlawful employment discrimination because of their race based on disparate treatment with cars and promotions. (Amended Complaint, par. 19, Plaintiff's Affidavit, par. 15). In addition to the reissuance of cars and promotions,

the black employees also complained about how Mr. Sparks would see them in passing and pretend that he did not see them when they spoke. Plaintiff found Mr. Sparks to be very rude and abrasive in his encounters with him. (Plaintiff's Affidavit, par. 14).    The commissioner's abrasiveness and rudeness were apparent in the A.S.E.A. meeting. (Exhibit "24" CD of A.S.E.A. meeting.  Mr. Crayton's abrasiveness is reflected even more in the Commissioner's November 16, 2004, response to the reprimand that Plaintiff received.  The letter is very mean spirited and smells of harassment. (Exhibit "25" – Commissioner's November 16, 2004, letter). Immediately after the Plaintiff complained to the A.S.E.A., the Defendant began retaliating against Plaintiff. The CD recording of Ron Sparks' encounter with Mr. McArthur and Mr. Williams further shows how abrasive and self-centered Mr. Spark's is. (CD of A.S.E.A. Meeting).

On or about June 29, 2006, Plaintiff returned from lunch and parked on the north side of the building next to the coliseum parking lot. As Plaintiff walked across the parking lot toward the covered walkway, Plaintiff noticed Jimmy Holley getting out of the passenger side of the Commissioner's vehicle. As Plaintiff approached the vehicle, Plaintiff noticed Mr. Sparks getting out of the driver's side. (This parking space is next to and to the right of the entrance to the covered walkway.) As Plaintiff walked pass the two gentlemen (within two feet) Plaintiff spoke, "How are you all doing? " They did not respond. Plaintiff proceeded toward the building. Approximately four to five paces beyond them, Plaintiff heard Mr. Sparks yell, but the voice tone and quality was not that of a salutation. As Plaintiff continued up the walkway, Mr. Sparks said, "John, I said hi."    Plaintiff

stopped, turned around to face them as they were walking toward him. Plaintiff replied, "I spoke to you all, did you not hear me speak to you?" By that time Mr. Holley and Mr. Sparks had caught up to Plaintiff on the walkway. Mr. Sparks in a loud voice yelled, "I was just trying to be nice to you, I don't understand why you are so rude and hateful toward me." Plaintiff's reply to him was, "commissioner, I spoke to you and you spoke to me, so let's just let it be at that." (Amended Complaint, par. 21.)

At that point, Plaintiff was still a step or two ahead of the two of them, and near the door to the lobby of the auditorium. As Plaintiff opened the door and stepped inside, Mr. Sparks made a remark that Plaintiff viewed as sarcastic, derogatory and harassing, "You people or you all", Plaintiff turned to look Mr. Sparks in the face; to indicate that he was aware of the derogatory nature of his remark and that it was not appreciated. Mr. Sparks and Plaintiff were face to face at this point. As Mr. Sparks stepped in side the door he made the statement "John are you threatening me? I'll have your ass arrested". Plaintiff's reply was, "Commissioner, do what you have to do." Plaintiff then turned around and proceeded up a set of steps to a card activated security door to avoid any further confrontation with the two of them. (Amended Complaint, par. 22).

As Plaintiff gained access to the secured area, Mr. Sparks yelled, "John, I want to see you in my office in 10 minutes!" Mr. Sparks immediately changed that from 10 minutes to "right now!" Plaintiff's reply was that he needed to go to his office to contact his A.S.E.A. representative. Mr. Sparks repeated his last

statement and Plaintiff complied with his demand.    (Amended Complaint, par. 23).

Plaintiff followed Mr. Sparks and Mr. Holley into Mr. Sparks' office and sat in a chair in front of Mr. Spark's desk. Plaintiff summoned Jeff Webb, an attorney for the department, to come to his office. Mr. Webb came in and took a seat next to Plaintiff. Mr. Sparks proceeded to tell Mr. Webb his version of the incident that had just taken place between he and Plaintiff. Without hearing Plaintiff's view, Mr. Webb's comment was "we can't have that in the workplace." Plaintiff was dismissed and Plaintiff went to his office and called the A.S.E.A. office and gave his version of the incident to Mr. Norbert Williams, attorney for A.S.E.A. (Amended Complaint, par. 24).

On or about July 2006, Plaintiff was reassigned from his position of seed director to a recently created position of Genetically Modified Plant and Products Director. (Amended Complaint, par. 25, Exhibit "29" – Letter of Transfer). To cover the real reason that Defendant placed Plaintiff in this position, Defendant stated that this was a position that Plaintiff should be proud to receive. This transfer to this position was a clever way of retaliating against Plaintiff by removing him from his position. On or about July 31, 2006, at around 9:45 a.m., Ray Hilburn (Plaintiff's supervisor) came to Plaintiff's office and informed Plaintiff that he, Ronnie Murphy and Doug Rigney wanted to meet with him in the upstairs board room at 10:30 a.m. Plaintiff arrived for the meeting at 10:25. No one was in the room. Around 10:40, Mr. Murphy came in for a few minutes and left. Around 10:50 Mr. Murphy returned to the room followed by Mr. Hilburn five minutes later.

Mr. Murphy informed the group that Mr. Rigney would not be attending the meeting. (Amended Complaint, par. 26).

The position of Genetically Modified Plants and Plants Products Program Director is nothing more than a sham on the by the Defendant to get Plaintiff out of the position of Seed Program Director and to transfer those duties to Agriculture Compliance. (Plaintiff's Affidavit, par 16). The Defendant lowered the Seed Program Director position to a Unit Manager Position. Plaintiff's duties were transferred to Benny Hitch. The Alabama Department of Agriculture clearly sets these duties out. (Exhibit "26" – Alabama Department of Agriculture and Industries Website, p. 2).

Mr. Murphy informed Plaintiff as to why he was summoned to this meeting. Plaintiff asked Mr. Hilburn to give Plaintiff a letter. The letter stated that Plaintiff's duties and immediate supervisor were being changed. It should be noted that this letter was not signed. Plaintiff was also given a Form 40 to sign. Plaintiff felt that he was being targeted for disparate treatment and continued discrimination and harassment because of his participation in statutorily protected activity. (Amended Complaint, par. 27).

After voicing his position and concerns, Mr. Murphy attempted to convince Plaintiff of the importance of this program. Mr. Murphy further stated that he was the only person in the Department qualified to handle these duties. He further stated that the change in duties would be a lateral transfer without an increase in salary. Plaintiff's response to this was that if this program is so important, why it wasn't announced so that other qualified applicants could apply. Normally

statewide jobs are competitive.    The transfer was actually a constructive demotion in retaliation for Plaintiff participating in statutorily protected activity. (Amended Complaint, par. 29).

At 4:25 p.m., on this same day, Mr. Murphy came to Plaintiff's office. Plaintiff was on the phone, Mr. Murphy left and returned about fifteen minutes later. Plaintiff was still busy with phone calls. At 4:55 Plaintiff was finally finished with his phone calls when Mr. Murphy came back to Plaintiff's office to tell him that the Commissioner wanted to see Mr. Murphy and Plaintiff in his office. Plaintiff informed Mr. Murphy that he had a 5:15 appointment. (Amended Complaint, par. 30).

Plaintiff left and returned with Mr. Sparks about five minutes later. Mr. Sparks informed Plaintiff that he wanted to talk with me about this very important program that was so badly needed in Alabama. He stated that Monsanto and Syngena thinks that there is a great need for such a program. Plaintiff repeated his concerns, reservations and lack of interest in the new position. (Amended Complaint, par. 31).

Plaintiff expressed his lack of interest in this newly created position. Plaintiff had grave reservations and misgivings regarding this position. Defendant claimed that the state so badly needed this position, yet didn't see the need to publicly announce the job so as to have a larger selection of applicants to choose from. Additionally, there were other concerns.  Plaintiff was especially concerned with the continual attempts by this administration to harass him, force him in a

position to fail, leave or to retire. Plaintiff felt threatened that if he did not take this position he would be fired. (Amended Complaint, par. 28).

Plaintiff further stated that his counterparts (State Seed Control Officials) in other states have "Genetic Engineering" as it relates to the seed industry as part of their regular duties. Plaintiff stated that he would gladly accept the added responsibilities as they relate to seed only, but he wanted to keep his position as State Seed Program Director. Mr. Sparks denied Plaintiff's request. (Amended Complaint, par. 32).

Mr. Sparks said among other things that he desired that Plaintiff take the job, if not "We will have to Part Company." Once again, Plaintiff felt that he was being harassed, threatened and retaliated against. (Amended Complaint, par. 33).

On or about August 1, 2006, at about 11:45, Mr. Murphy came to Plaintiff's office and informed him that Plaintiff was to cease and desist all of his activities and duties as the State Seed Program Director immediately and vacate the office by 5:00 p.m. Friday, August 4, 2006. (Amended Complaint, par. 34).

Plaintiff was reassigned to an office with no chair. Plaintiff felt that this was another attempt by Defendant to embarrass, harass, intimidate and retaliate against Plaintiff. (Amended Complaint, par. 35).

Plaintiff was the first black to hold the position of Seed Program Director. Plaintiff's position was awarded to a less qualified white following Plaintiff's reassignment. Plaintiff's position was reorganized and placed under Benny

Hitch, program director for the Agriculture Compliance.    Plaintiff was discriminated against based on his race. (Amended Complaint, par. 36).

On or about September 27, 2006, Plaintiff filed a racial discrimination and retaliation charge against Mr. Ron Sparks and Alabama Department of Agriculture and Industries with the Equal Employment Opportunity Commission.

On or about November 14, 2006, Plaintiff was summoned to Deputy Commissioner Ronnie Murphy's (Plaintiff's new supervisor) office for a meeting. Upon arrival at the meeting, Plaintiff was informed that the purpose of this meeting was to discuss a supervisor referral for an employee assistance program for Plaintiff. Plaintiff was told that the referral was mandatory and that he had to contact the Behavioral Health System Care Coordinator by December 5, 2006, to schedule an appointment to see a psychiatrist. This was another instance of Defendant harassing and retaliating against Plaintiff due to Plaintiff participating in statutorily protected activity. (Second Complaint, par. 9). Once again, Plaintiff was retaliated against.

On or about May 3, 2007, Plaintiff filed another charge of racial discrimination and retaliation as a result of the November 14, 2006, meeting with Ronnie Murphy and Mr. Murphy's failure to complete his annual evaluation by the April 30 deadline. (Second Complaint, par. 7). The EEOC complaint was also based on Plaintiff being referred to Behavior Health Services to see a psychiatrist. Defendant did not believe that Plaintiff was in need of counseling. This was simply retaliation against Plaintiff.    The assessment revealed that

Plaintiff had no behavior problems. The assessment further showed that this was just a retaliatory action by Defendant. (Exhibit "28" – BAS Assessment).

On or about May 18, 2007, Mr. Jerome Gray (Executive Assistant) requested a meeting with Plaintiff to allegedly discuss Plaintiff's annual evaluation. Mr. Gray wanted to know if Plaintiff would be willing to drop the May 3, 2007, E.E.O.C charges. Plaintiff informed Mr. Gray that he was not willing to drop the charges. This was yet another attempt by the Defendant to harass and retaliate against Plaintiff for participating in statutorily protected activity.

The Plaintiff is of the belief and provides evidence that he has been discriminated against in violation of Title VII of the 1964 Civil Rights Act, as amended based on race and in retaliation to his complaint of the discriminatory treatment of blacks in the workplace and with A.S.E.A. and the EEOC.

### III. ARGUMENTS AND AUTHORITIES

#### A. Standard of Review for Summary Judgment

In reviewing a motion for summary judgment, the Court must "review the record in a light most favorable to the nonmovant and must resolve all reasonable doubts against the movant." *Kimbrell v. Focras, Inc.,* 2002 WL 31041847 (Ala.Civ.App.).

According to *Burrell v. Runyon, Jr.,* 1996 U.S. Dist. Lexis 8656, "Section 704(a) of Title VII makes it "an unlawful employment practice for an employer to discriminate against any of his employees... because she has opposed any practice made an unlawful employment practice by this subchapter, or because she has made a charge, testified, assisted, or participated in any manner in an

investigation, proceeding, or hearing under this subchapter." To establish a prima facie case for discrimination for disparate treatment, the Plaintiff must show that (1) she is a member of a protected class; (2) has engaged in or been accused of engaging in misconduct similar to persons outside of her protected status and (3) similarly situated person received more favorable treatment. *Early v. Morris Newspaper Corp.*, 54 F. Supp. 2d 1261, 1271 (M.D. Ala. 1999) To establish a prima facie case for retaliation, a Title VII Plaintiff must show that (1) she was engaged in statutorily protected activity, (2) she suffered an adverse employment action, and (3) a causal connection exits between the protected activity and the adverse employment action. To establish a claim under 42 U.S.C.S. the Plaintiff must allege that the deprivation by the defendant was when the defendant was acting under the color of law deprived any person on any rights, privileges, or immunities secured by the United States constitution or federal law.

Where there are questions as to whether the alleged conduct complained of exits, a summary judgment is not appropriate. As per the applicable legal standard for summary judgment, the Plaintiff has presented substantial evidence that a fair-minded person would infer the existence of the fact sought to be proved. Because of the applicable law, pleadings, depositions and affidavits attached hereto the Defendant has not met the standard of review such that summary judgment is proper.

## PLAINTIFF'S CLAIMS WERE PROPERLY RAISED IN EEOC COMPLAINT

In an EEOC charge, the intake officer only takes in minimal information.

Ms. Burton's charge (Exhibit "12" – EEOC Complaint) states as follows:

> I began my employment with the employer named above as a seed analyst on May 19, 1976. Upon Mr. Lance Hester Becoming my supervisor, I began to be subjected to adverse terms and conditioned of employment in my position of seed program director. Mr. Hester constantly challenged decisions that I made regarding a particular product although he had no expertise in the area to which I was assigned. The position of seed director was considered to be very influential and one would come in contact with people who had power. During June 2006, I complained to the Alabama Sate Employees Association that I, as well as other Blacks were being subjected to unlawful employment discrimination because of our race. On July 18, 2006 (sic), I was reassigned from my position of seed program director to a recently created position of genetically modified plant and plants products director. I was the first Black to hold the position of seed program director and the position was awarded to a lesser qualified White following my reassignment. I believe that I was discriminated against in violation of Title VII of the 1964 Civil Rights Act, as amended because of my race, Black and in retaliation to my complaint of unlawful discrimination.

The second EEOC Complaint provided as follows:

> I am a Black and I was hired by the above named employer on May 19, 1996, as a seed analysis (sic) and I was eventually promoted to seed program director. On July 28, 2006, I was demoted to the position of genetically modified plant and plants program director, which I protested. On September 27, 2006, I filed charge 420-2006005216 because of my demotion and reassignment to another job. On November 30, 2006, my supervisor had me to enroll in an employee assistance program, which I protested. I had a schedule (sic) job performance review that should have been completed no later than April 30, 2007. Any pay raise that I would have received is based on my job performance review being completed in a timely manner, which has not occurred. On May 2, 2007, I learned from personnel that my supervisor should have completed and submitted my annual job performance review as required by April 30, 2007, so that I would be eligible for a merit raise. I believe I am being discriminated against because of my race, Black and in retaliation for having filed a previous charge in violation of Title VII of the Civil Rights Act of 1964, as amended.

The Plaintiff's claims are not time barred

Plaintiff properly indicated that the actions taken against him were continuing. The complaints that Plaintiff brings forth are not discrete acts, they are continuing. Based on the fact that the discrimination and retaliation against Plaintiff were continuing, Plaintiff had the right to bring all of his complaints of discrimination and retaliation that relate to the timely filed complaint of discrimination/retaliation.    Since these actions by the Defendant were a continuing violation, Plaintiff is allowed to bring all of his complaints if at least one of his claims falls within the applicable 180 day window. The retaliation that occurred on July 28, 2006, falls within the applicable 180 days; therefore, each charge is timely filed. The ultimate retaliation was ultimately related to the acts of failure to promote, discrimination, retaliation and the hostile work environment that Plaintiff was subjected to. These acts were so intricately related until it is clear that they were part of the same acts that Plaintiff mentioned in his EEOC Complaint.

## PLAINTIFF HAS MADE VIABLE CAUSES OF ACTION FOR TITLE VII CLAIMS

### Race Discrimination

As previously discussed, where there are questions as to whether the alleged conduct of discrimination in violation of Title VII of the Civil Rights Act of 1964, to establish a prima facie claim of racial discrimination, the following elements must be met: (1) Plaintiff belongs to a racial minority; (2) that he was subjected to an adverse employment action; (3) that Plaintiff was treated less favorably than similarly situated employees who are not members of this minority class  Then, the Defendant must bring

forth a legitimate nondiscriminatory reason for the adverse employment treatment. If this burden is met, the burden then shifts to the Plaintiff to show that the real reason for the adverse action is discrimination.

<u>Racial Minority</u>

In the case before this Honorable Court, Plaintiff is a member of the protected group, as he is black. Therefore, the first element is met.

<u>Subjected to adverse employment action</u>

Plaintiff was subjected to adverse employment treatment. In April 2005, the Governor sent out a mandate to have all unnecessary care turned in. Plaintiff's car was taken and not returned to him as other members of management were.

Plaintiff was transferred from his position of seed director to genetically modified plant and plants product director. This was in effect a constructive demotion.

<u>Plaintiff treated less favorably</u>

After the cars were taken up, White employees soon thereafter received their cars back; however, Plaintiff did not. Plaintiff was treated less favorably than Benny Hitch, Lance Hester, Tomm Johnson, Tony Cofer and Joe Debro, white/males. The Defendant states that Plaintiff did not use his car for substantial traveling. Though this may be true, Tomm Johnson, Tony Cofer and Joe Debro also used their vehicle predominately for travel to and from home, yet their cars were returned. These individuals were similarly situated to Plaintiff as they were management.

With regard to being transferred, Plaintiff was replaced by Benny Hitch a white male. The reasons offered by the Defendant for their actions as discussed above are of such a nature that a genuine question exists as to whether or not the reasons given by the Defendant for their actions was intentional discrimination. As such, Plaintiff has presented a prima facie case for this matter to be submitted for consideration by a jury of his peers.

## PLAINTIFF WAS RETALIATED AGAINST

## PLAINTIFF HAS MET THE LEGAL REQUIREMENTS FOR RETALIATION

### Plaintiff was involved in statutorily protected activity

Plaintiff was involved in statutorily protected activity. Plaintiff was involved in protected activity when he filed his complaint with A.S,E.A. in June of 2006 and when he filed his EEOC Complaint on September 27, 2006.

### Plaintiff suffered an adverse employment action

With regard to the A.S.E.A. Complaint, Plaintiff was suffered an adverse employment action when he was transferred from the position of seed program director to the position of genetically modified plant and plants product director. This was direct retaliation for the A.S.E.A. complaint.

The Plaintiff also suffered adverse employment action when he was made to undergo a psychiatric evaluation on November 14, 2006, in retaliation for filing his September 28, 2006, EEOC complaint. After the assessment it was shown that this adverse employment action was in retaliation for the EEOC complaint.

### Causal Connection

The Defendant provides in its Motion for Summary Judgment that there is no causal connection between involvement in statutorily protected activity and the adverse employment action Plaintiff received. Plaintiff was transferred from his position only after he voiced his displeasure to the A.S.E.A. The complaint to A.S.E.A. was in June 2006. Only a month later, Plaintiff was transferred. Likewise, immediately after the filing of the EEOC charge, Plaintiff was made to undergo a mental evaluation. The Defendant was aware of both filings. Mr. Sparks was at the A.S.E.A, meeting and he was also aware of the EEOC filing . There is a causal connection between the statutorily protected activity the Plaintiff was involved in and the disparate treatment he received.

### PLAINTIFF WAS SUBJECTED TO HOSTILE WORK ENVIRONMENT

### Plaintiff's treatment was casually related to Defendant's creation of a hostile work environment

In order to establish a hostile work environment claim the Plaintiff must show that (1) He belongs to a protected group; (2) he has been subjected to unwelcome harassment; (3) the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create such a discriminatory abusive working environment, and (4) the employer was responsible for such environment under the theory of vicarious or direct liability. *Williams v. Alabama Pub. Health Dept.,* 2005 U.S. App. LEXIS 27285. Plaintiff has met the burden of protected group, as Plaintiff is black, thus, the first element is met.

Plaintiff was subjected to unwelcome harassment based on race

Plaintiff was subjected to unwelcome harassment based on his race. Plaintiff constantly protested the harassment and made it known to the

Defendant that he simply wanted to be left alone to do his job. It is clear that the harassment was unwelcome. Plaintiff was harassed throughout his tenure because of his race. Plaintiff has satisfied the second element.

Defendant's Harassment was Severe or Pervasive

An employee's work environment is sufficiently severe or pervasive when the Plaintiff shows that the frequency and severity of the actions of the Defendant are such that they unreasonably interfere with an employee's work environment. Further, the work environment was humiliating and embarrassing. There were a great number of such episodes that made Plaintiff's work environment sufficiently hostile. Included in these are: (1) April 1, 2004, meeting regarding employee get together meetings; (2) October 4, 2004, Plaintiff was reprimanded unfaiy for problem that were caused by a problem with the break down of the computers; (3) October 4, 2004, Sparks sent letter to industry usurping Plaintiff's authority as seed director, (4) once Defendant transferred Plaintiff, Defendant sent Plaintiff to an office without a chair and (5) June 29, 2006, Mr. Sparks harassed Plaintiff as he was walking into building. Clearly, these harassing actions were severe or pervasive. They interfered with the Plaintiff's work environment.

The Defendant had actual and constructive notice of harassment, thus adequate notice was given to warrant liability

The Defendant has a policy that discriminatory or wrongful acts should be reported the Defendant. Plaintiff reported such incidents in that the acts were communicated directed to and directly involved Defendant. For example all pof these incidents directly involved the commissioner, therefore, it is clear that the

defendant had actual notice and constructive notice adequate to warrant liability on the part of tDefendantant.

## **PLAINTIFF HAS SUCCESSFULLY MADE A CLAIM FOR FAILURE TO PROMOTE**

To successfully make a claim for failure to promote, the Plaintiff must show (1) that he belonged to a protected group; (2) applied for and was qualified for job; (3) despite qualifications, was rejected and the position was filled with a person not in the protected group. Plaintiff is a member of the protected group as he is black. Plaintiff applied for the position of division director on April 30, 2003.

Plaintiff was qualified for the position due to his vast experience and education. Plaintiff had worked in a supervisory position for over 21 years with a successful tract record working in a demanding, fast-paced environment requiring stamina, patience, time management skills and an ability to work with people as well as work independently. Plaintiff surpassed the educational requirement. Plaintiff had more supervisory experience than Lance Hester. [add bit about manipulating personnel ranking) Yet, Lance Hester was chosen for the position. Hester is not a member of the protected class.

## **CONCLUSION**

The evidence presented by Plaintiff as to being discriminated against and subjected to hostile work environment and retaliated against due to his involvement in statutorily protected activity and the Defendant's knowledge of said participation are certainly at issue are questions that should be decided by a jury of Plaintiff's peers.

Based on the facts, caselaw and evidence that is in direct dispute to Defendant's claims; there is a genuine issue of material fact to be submitted to the jury.    Where there are questions, the case must go to trier of fact.

**WHEREFORE PREMISES** considered, Plaintiff request that this Honorable Court deny Defendant' request for summary judgment.

Respectfully submitted this the 23rd day of June 2008.

JURALDINE BATTLE-HODGE (BAT033
Attorney for Plaintiff

LAW OFFICES OF JURALDINE BATTLE-HODGE
207 Montgomery Street, Suite 215
Montgomery, Alabama 36104
Telephone:  (334) 262-1177, 263-5575
Facsimile:  (334) 263-5569

## CERTIFICATE OF SERVICE

I hereby certify that on the 23rd day of June 2008, the foregoing document was served upon the following counsels via electronic filing as follows:

Hon. Emily C. Marks
Hon. E. Hamilton Wilson, Jr.
BALL, BALL, MATTHEWS & NOVAK, P.A.
2000 Interstate Park Drive, Suite 204
Post Office Box 2148
Montgomery, AL 36102-2148

_____
Of Counsel